```
 1                  UNITED STATES DISTRICT COURT
                       DISTRICT OF MINNESOTA
 2
      ------------------------------------------------------------
 3                                  )
      United States of America,     )   File No. 20-cr-211
 4                                  )            (PAM-ECW)
             Plaintiff,             )
 5                                  )
      vs.                           )   St. Paul, Minnesota
 6                                  )   June 10, 2021
      Victor Lee Childers,          )   9:10 a.m.
 7                                  )
             Defendant.             )
 8    ------------------------------------------------------------
 9
             BEFORE THE HONORABLE ELIZABETH COWAN WRIGHT
10          UNITED STATES DISTRICT COURT MAGISTRATE JUDGE
                          (MOTION HEARING)
11              (Excerpt - Testimony of Witnesses)

12    APPEARANCES
       For the Plaintiff:        U.S. Attorney's Office
13                               RUTH SHNIDER, AUSA
                                 600 U.S. Courthouse
14                               300 South Fourth Street
                                 Minneapolis, Minnesota 55415
15
       For the Defendant:        Federal Public Defender's Office
16                               DOUGLAS OLSON, ESQ.
                                 107 U.S. Courthouse
17                               300 South Fourth Street
                                 Minneapolis, Minnesota 55415
18
       Court Reporter:           ERIN D. DROST, RMR-CRR
19                               Suite 146
                                 316 North Robert Street
20                               St. Paul, Minnesota 55101

21

22

23

24
          Proceedings recorded by mechanical stenography;
25    transcript produced by computer.
```

1                          <u>**I N D E X**</u>

2                                                              <u>PAGE</u>

3       **ERICA HUSTON**
           Direct Examination by Ms. Shnider                    4
           Cross-Examination by Mr. Olson                      19
4
        **RICK PORRAS**
5          Direct Examination by Ms. Shnider                   34
           Cross-Examination by Mr. Olson                      46
6          Redirect Examination by Ms. Shnider                 55

7       **WILLIAM ERIC BERG**
           Direct Examination by Ms. Shnider                   57
8          Cross-Examination by Mr. Olson                      64

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          **P R O C E E D I N G S**

2                    **IN OPEN COURT**

3          (Defendant present)

4               THE COURT:  All right.  With that, does the

5     Government want to call its first witness?

6               MS. SHNIDER:  Yes, Your Honor, I'm going to send

7     the agent out to grab.  The Government will call first

8     Officer Erica Huston.

9               THE COURT:  Okay.  Thank you.

10               All right.  Officer Huston, if you could come on

11     up to the witness stand and then I'll swear you in, please?

12               THE WITNESS:  Yes, ma'am.

13               THE COURT:  And just a few COVID logistics here.

14     You can see we have a protective covering on the microphone.

15     The stand has been cleaned and so on, so you are free to

16     remove your mask when you testify or leave it on, just so

17     you know that.

18               THE WITNESS:  Perfect.  Okay.

19               THE COURT:  Okay.  All right.  If you could go

20     ahead and raise your right hand and state your name, please?

21               THE WITNESS:  Erica Huston.

22               THE COURT:  And how do you spell your last name?

23               THE WITNESS:  H-u-s-t-o-n.

24          (Witness sworn.)

25               THE COURT:  Okay.  Thank you.  You may sit down.

```
 1                 THE WITNESS:  Thank you.
 2                 THE COURT:  Let me just check with counsel, does
 3       anyone have any concerns with the witness removing her mask
 4       or --
 5                 MS. SHNIDER:  None from the Government.
 6                 MR. OLSON:  No.
 7                 THE COURT:  Okay.  Thank you.
 8                 And you may proceed.
 9                 MS. SHNIDER:  Thank you, Your Honor.
10                           (Erica Huston)
11                         DIRECT EXAMINATION
12       BY MS. SHNIDER:
13       Q.  Good morning, Officer Huston.
14       A.  Good morning.
15       Q.  Where are you employed?
16       A.  The City of Burnsville.
17       Q.  And what is your title there?
18       A.  My current title is behavioral health unit officer.
19       Q.  And what does that involve?
20       A.  I am now part of a unit that just strictly responds to
21       any kind of mental health crisis in our city.
22       Q.  What was your role with Burnsville in July of 2020?
23       A.  Patrol officer.
24       Q.  And how long were you in law enforcement with
25       Burnsville?
```

CASE 0:20-cr-00211-PAM-ECW Document...

```
 1    A.  I am just nearing 20 years.
 2    Q.  And I'm sure there's a lot of things in there, but just
 3    sort of at a high level what sorts of things have you done
 4    for the police department?
 5    A.  I have been a detective with our investigations unit.  I
 6    am part of our honor guard team.  I'm a field training
 7    officer.  I'm a domestic abuse response team officer and --
 8    oh, goodness, what else?
 9    Q.  A jack of all trades.  You --
10    A.  Kind of, it's been 20 years.
11    Q.  So were you on duty as a patrol officer on the morning
12    of July 25th, 2020?
13    A.  I was.
14    Q.  That was your birthday in fact?
15    A.  That was my birthday.  It's memorable.
16    Q.  Did you respond to a shots fired call shortly before
17    8:00 a.m.?
18    A.  I did.
19    Q.  And explain for us sort of where you were when you first
20    got information about that call.
21    A.  Actually, all of our officers, our entire shift was
22    still in our briefing.  We started at 7:00 a.m. that
23    morning, and -- which is our normal shift.  I believe we
24    were dispatched to that call at about 7:55, 7:56, and so all
25    of our units went from Burnsville Police Department down to
```

1    Black Dog Road together.

2    Q.  And what was the information you initially received

3    about what had been reported?

4    A.  We received information over dispatch that there was

5    three males on the riverfront firing rounds into the water

6    and across the waterfront.  We received a description of the

7    three individuals and proceeded down to Black Dog Road.

8    Q.  And so was it your understanding that a civilian had

9    called 911 to report this information?

10    A.  That's correct.

11    Q.  And where was the incident reported to be occurring?

12    A.  On the -- in Riverfront Park area of our city on Black

13    Dog on the waterline.

14    Q.  Is that an area you're pretty familiar with?

15    A.  I am.  I worked that area of the city for 12 years.

16    Q.  So did you -- after you got the call, did you head over

17    to that location?

18    A.  I did.

19    Q.  And once you were in your squad vehicle, how was

20    information from dispatch being relayed to you?

21    A.  Both on our MDC and on the air.

22    Q.  What is MDC?

23    A.  Our MDC is our computers that are in our vehicles.

24    Q.  And you and I have, prior to this hearing, discussed

25    Government's Exhibit 1, which is the dispatch notes from

1    this incident; correct?

2    A.  We have.

3    Q.  And is that a true and correct copy to the best of your

4    recollection of the information that was coming through to

5    you that morning on July 25th?

6    A.  It is.

7    Q.  So this is -- this comes through both on your laptop

8    essentially, but then substantially the same information is

9    aired out audibly as well?

10   A.  Correct.

11   Q.  Okay.  All right.  So I'd like to now go through

12   Government's Exhibit 1.  I know the paper exhibit is

13   painfully small, so I've sort of blown it up in the relevant

14   portion.

15       So we see here down at the bottom in the comments

16   section, "Male standing on shore shooting a nine millimeter

17   into the water or could be a .45.  W/M," is that white male?

18   A.  White male.

19   Q.  "White male, 26 to 28 years of age"?

20   A.  Correct.

21   Q.  "Black shirt on Black Dog," so is that Black Dog Road?

22   A.  Black Dog Road.

23   Q.  "Appears to be alone."  "RP," what's RP?

24   A.  Reporting party.

25   Q.  "Reporting party can hear him firing, never saw the

CASE 0:20-cr-00211-PAM-ECW   Doc. 37

 1    gun."

 2        Now I'm going down to the second page here.  And then it

 3    says, "Three males now.  Two black males, one

 4    lighter-skinned male."  So is this kind of evolving as the

 5    dispatcher is getting more information?

 6    A.  It is.

 7    Q.  "Reporting party is a group of five.  They are all at a

 8    safe location."  Then Number 11 says, "Attachment rapid loc

 9    added."  What does that mean?

10    A.  That means the 911 call that comes in, they locate that

11    phone to a certain area so that if the caller has to drop

12    the call or something occurs where there's an emergency and

13    they can no longer talk, they can locate that phone.

14    Q.  Got it.  Then it says, "Reporting party cannot see them

15    or hear them anywhere."  What does that suggest to you?

16    A.  Either they left the area, the three individuals --

17              MR. OLSON:  Objection, speculation.

18              THE COURT:  Overruled.

19    BY MS. SHNIDER:

20    Q.  Go ahead.

21    A.  Okay.  That could mean -- that could mean various

22    things.  That could mean they either left the area, the

23    reporting party left the area, the three subjects that were

24    shooting the gun left the area.

25    Q.  And then it says, "Reporting party said he is near where

1    the water drops off, where the barges are, D45105 out with

2    2."  That's you; right?

3    A.  That is me.

4    Q.  Okay.  We'll come back to what that was.  "Reporting

5    party is near some gates."  And then, "Ping update to bridge

6    over canal -- oops -- that goes from the river to the lake."

7    And then it looks like a query from one of your colleagues

8    that's running the license plate of the vehicle that was

9    stopped?

10   A.  Correct.

11   Q.  And then, "Reporting party meeting up with an officer

12   now," and then what does 10-33 traffic mean?

13   A.  That just means stop any traffic.  We share our radio

14   frequencies with Lakeville and Farmington, and that would

15   mean no one has any non-emergency traffic at the time, so

16   only we hold the channel for our call.

17   Q.  So is that just sort of a signal that a traffic stop has

18   been commenced?

19   A.  No, actually, it's only an emergency.  That's only used

20   when we don't want anyone else to get on the air and talk so

21   that we -- we're holding the channel just for our situation.

22   Q.  Got it.  So is what we read through consistent with the

23   information you recall having --

24   A.  It is.

25   Q.  -- when you were on the scene that morning?

```
 1   A.  It is.

 2   Q.  What -- based on the report, what offenses do you

 3   believe could possibly be being committed?

 4   A.  Several.  It would violate our city ordinance to have a

 5   firearm in a park.  That is a city park.  But most

 6   importantly reckless discharge of a firearm.

 7   Q.  So it's a felony under state law to recklessly discharge

 8   a firearm --

 9   A.  It is.

10   Q.  -- within a municipality?

11   A.  Yes.

12   Q.  And so based on that type of report, what are your

13   safety concerns on a scene like that?

14   A.  A lot.  Knowing that there's a weapon involved, we have

15   witnesses -- or a reporting party that saw a firearm

16   possibly, that they were all fishing, and that there is

17   several civilians possibly down there.  It's an area that on

18   a weekend in the morning, it's very isolated, and the only

19   people down there typically are fishermen and bicyclists.

20   Q.  So tell -- were you the first to arrive on the scene?

21   A.  I was the first to arrive, correct.

22   Q.  And were you sort of in the area that's consistent with

23   what the dispatch and the caller were reporting in

24   Riverfront Park?

25   A.  Yes, it's -- Black Dog Road is a very isolated area in
```

1    the city.  It's right on the riverfront that crosses into

2    Bloomington.  I know the area very well, and there's really

3    only one area that public goes to and it would be that park.

4    If you went to the left, which is under the bridge of 35, it

5    goes to a salt plant where the barges are actually.  If you

6    go to the right, that's the park, and that's the spillway

7    area that would be consistent with where he's saying this is

8    occurring.

9    Q.  Okay.  And so what was the first thing that happened

10   right when you pulled into that area?

11   A.  I saw a car stopped on the shoulder of Black Dog Road,

12   which is not -- it's not that it's not common, but it's

13   strange with this call happening, and a white male was just

14   getting out of the car.  So I stopped out with that vehicle

15   first, and at one point realized that it was an unrelated

16   person.  I inquired if they heard anything or saw anything.

17   They did not.

18       As I was doing that, my partner, Officer Jimenez, pulled

19   up to me, and I looked to my left and I saw three subjects

20   exit the wooded area and go into the parking area.  And I

21   told Officer Jimenez to go stop because they matched the

22   description that was provided by dispatch.

23   Q.  Okay.  And so you did this a little bit already and

24   we'll see it in some later witness's body cam, but describe

25   this area a little bit, what it kind of looks like?

```
 1    A.  So Black Dog Road exits from 35 only.  And once you go

 2    down, it's a T stop.  And so right in front of you is the

 3    river.  And like I said, you can go left, which would be to

 4    U.S. Salt, which is a commercialized area that doesn't have

 5    any access.  Knowing that someone called that was probably

 6    fishing out there, you would go to the right, and that would

 7    go to Riverfront Park, at which point the road stops and

 8    there's a gated area into Xcel Black Dog Energy Center and

 9    there's no public access into that.

10    Q.  And, again, this was shortly before 8:00 a.m. in the

11    morning?

12    A.  Correct.

13    Q.  Are there a lot of people milling around there at that

14    time of day usually?

15    A.  No, not at all.  On a weekend, it's a couple people

16    fishing down there.

17    Q.  So you said fishing or maybe working out, biking,

18    jogging?

19    A.  Biking.  There's a bike trail now that goes -- that runs

20    along the riverfront.

21    Q.  Okay.  And so then you said you saw three individuals

22    that you believed were connected to the reported incident;

23    correct?

24    A.  I did.

25    Q.  Could you just explain, as much as you can, why when you
```

ERIN D. DROST, RMR-CRR
(651) 848-1227

1    saw those individuals, you believed that they were the three

2    suspects?

3    A.  First and foremost, it's the only people I saw.  There

4    was no other public moving around.  Everyone was already

5    down by the river possibly.  There were quite a few cars

6    parked, but there was no other people.  And I saw three

7    males walk into the parking area.  It was the only people

8    there, and they matched the description.

9    Q.  When you say --

10   A.  It was a light-skinned white male and two black males.

11   Q.  And what was the white male wearing?

12   A.  A black shirt.

13   Q.  And they didn't appear to be fishermen or bicyclists?

14   A.  No, they did not appear that way.

15   Q.  And, I'm sorry, you saw them coming out of the woods and

16   getting into a vehicle, did you say?

17   A.  They were walking up -- there's several paved paths in

18   the area, and they were walking up into the parking area,

19   yes.  And I looked to my left -- as I told the gentleman I

20   was out with that you can go now, you're not involved, I

21   looked to my left and saw the three subjects walking up to

22   the silver car.

23   Q.  And did you believe at that time they could be armed and

24   dangerous?

25   A.  I did.

```
 1   Q.  And so what did you do?

 2   A.  I motioned to the officers, and there was several other

 3   squads that came in behind me, to go stop the individuals

 4   and identify them.

 5   Q.  And in your training and experience, would that be

 6   considered a more high-risk traffic stop?

 7   A.  Absolutely.  If there's a weapon involved, it is, and

 8   that was why we would conduct a felony stop.

 9   Q.  And talk a little bit about what the procedures are in a

10   felony stop.  Will officers have their guns drawn?

11   A.  They will, yes.

12   Q.  And how will occupants of the vehicle be secured?

13   A.  They'll be removed from the vehicle by either verbal

14   commands either over a microphone or some type of

15   stereo-type thing, or they'll just shout out commands.  One

16   at a time, they'll be removed.  They'll walk backwards and

17   they'll be handcuffed and then secured in vehicles.

18   Q.  And, again, you said that's -- in this case, it's

19   because of the concern of weapons?

20   A.  Correct.

21   Q.  So were the three occupants ordered out of the vehicle

22   as you just described?

23   A.  They were, and I only came into that area once they were

24   being removed out of that vehicle.

25   Q.  Who was the driver of that vehicle ultimately identified
```

ERIN D. DROST, RMR-CRR
(651) 848-1227

```
 1    as?

 2    A.  Vic Childers.

 3    Q.  And the two other African-Americans, I don't want to get

 4    into their names on the record --

 5    A.  Correct.

 6    Q.  -- but they were ultimately identified as juveniles;

 7    correct?

 8    A.  They were.

 9    Q.  Okay.  And so we'll hear more about what happened next,

10    but just sort of summarize at a high level what happened

11    after that.

12    A.  All of the occupants were ultimately removed out,

13    handcuffed, and secured.  Each officer typically on a felony

14    stop like this would take each occupant to three separate

15    squad cars, and then officers would stay with them as they

16    were detained and begin to question about what was going on

17    and investigate why we were -- why we were there and figure

18    out kind of what was going on, investigate the stop.

19    Q.  And then the car was ultimately searched for weapons;

20    correct?

21    A.  It was.

22    Q.  And what was found?

23    A.  Two firearms.

24    Q.  And then was Mr. Childers placed under arrest?

25    A.  He was placed under arrest, and there was also evidence
```

1    found on his person.

2    Q.  But there was also a medical concern there; right?

3    A.  There was.

4    Q.  What happened there?

5    A.  Officer Porras spoke to him, and at one point

6    Mr. Childers indicated he had ingested methamphetamines.

7    Q.  So was he brought to the hospital?

8    A.  He was.  Medics were called immediately, and he was

9    taken right there.

10   Q.  And what about the two juveniles, what happened with

11   them?

12   A.  They were both detained on scene until we could figure

13   out kind of their identities.  It took about -- I want to

14   say about 30 to 40 minutes to figure out who they were

15   actually.  There was a lot of inconsistencies during

16   interviewing procedures.  And so we finally figured out who

17   they were, and they were ultimately transported to the

18   Burnsville Police Department and released to adults.

19   Q.  And -- excuse me -- you also spoke to some eyewitnesss

20   on the scene; right?

21   A.  I did, two separate ones -- or three --

22   Q.  In fact, did somebody walk up while everyone was still

23   on the scene, including the suspects?

24   A.  The two juveniles were still in the car and I believe

25   Mr. Childers had left the scene during the conversation with

1    him.  And he wanted to get something -- retrieve something

2    out of his vehicle.  And so at one point, I inquired if he

3    had seen or observed anything, and he did.  And so I spoke

4    to him in depth.  Secondly, I spoke to the reporting party

5    finally.  He approached us after everyone was secured and

6    vehicles were gone.

7    Q.  And so that -- just focusing on the gentleman who sort

8    of walked up to the scene, what did he report to you about

9    what had happened?

10   A.  He was standing on the shoreline next to the three

11   individuals that were firing off rounds.  The -- I guess the

12   biggest thing is the gun was being passed, he was saying,

13   from the three individuals.  They were shooting rounds into

14   the water and across onto the Bloomington side as well.

15   Q.  And did he seem to confirm that it was the three people

16   who had been arrested?

17   A.  Yes.

18   Q.  And so then you said you went -- did he bring you down

19   to the riverbed at that point, show you where they were?

20   A.  Yep, he went down -- we walked down to the riverfront,

21   and he -- I was looking for shell casings to try and just

22   get a location exactly where this happened.  At which point,

23   I located several of them.  I believe there was a

24   conservation officer with me that stayed on scene and

25   secured them while an evidence officer responded down to the

1     scene to both collect and photograph.

2         While I was there doing that, the reporting party

3     approached me, indicated to me that he was afraid for his

4     safety and he didn't want to talk to me until everyone was

5     gone.

6     Q.  And what did he ultimately share with you?

7     A.  He confirmed exactly what the first witness said, that

8     the three individual subjects were passing the gun between

9     the three of them and shooting off rounds into the water.

10    Q.  And these witnesses said the same thing, that it had

11    been a white male and then two black males; correct?

12    A.  Yes.

13    Q.  Okay.  So after you finished processing evidence, did

14    that kind of end your --

15    A.  It ended my role, yes.  I didn't do any other

16    interviewing or questioning.  I think I went back to the

17    station.  I believe the two juveniles were still there and

18    they got picked up --

19              THE COURT REPORTER:  And they -- I'm sorry --

20    what?

21              THE WITNESS:  I responded back to our police

22    department.  I'm sorry.

23              THE COURT REPORTER:  That's okay.

24              THE WITNESS:  And at which point the two juveniles

25    were picked up by guardians of some sort.  I don't recall

1    who it was.

2              MS. SHNIDER:  Okay.  Nothing further on direct,

3    Your Honor.

4              THE COURT:  Okay.  Thank you.

5              Mr. Olson.

6              And, Officer Huston, I'm just going to ask you to

7    slow down a little bit when you are talking.

8              THE WITNESS:  Sure.

9              THE COURT:  I'm a fast talker myself, but it's

10   helpful for everyone, okay?

11             THE WITNESS:  Yes, ma'am.

12             THE COURT:  Thank you.

13                    **CROSS-EXAMINATION**

14   BY MR. OLSON:

15   Q.  So, Officer Huston, so you were dispatched to this

16   location by Riverfront Park and Black Dog Road at about -- a

17   little bit before 8:00 a.m. on July 25th; right?

18   A.  Yes, sir.

19   Q.  All right.  And you responded because of the 911 call

20   and the information that had gone out on dispatch; correct?

21   A.  Correct.

22   Q.  Were you running your body camera at that time?

23   A.  Not when I was dispatched to the call, no.

24   Q.  Okay.  When did you start running your body cam at that

25   point?

1    A.  I initiated my body camera after the first contact with

2    the male that was unrelated.

3    Q.  Okay.  And -- all right.  We'll get to that.

4       But so initially you were responding to the dispatch

5    notes that were being aired and also being -- they come up

6    on your computer terminal, is that how that works?

7    A.  It is.

8    Q.  And that's the notes that you went through with the

9    Government on Exhibit 1; correct?

10   A.  Yes.

11   Q.  So the -- and on the dispatch notes, I won't -- the

12   dispatch notes, when you look at them, they also have times

13   associated with the dispatch notes; right?

14   A.  Typically they do, yes.

15   Q.  All right.  And the dispatch notes start at 7:57 with a

16   "Male standing on shore shooting a nine millimeter into the

17   water"; right?

18   A.  Yes.  That would indicate the call taker of our dispatch

19   center entering those notes at that time.

20   Q.  Right.  And then those notes are just chronologically

21   being entered as you went through with Ms. Shnider; right?

22   A.  That is correct.

23   Q.  All right.  And the persons -- the reporting started,

24   and those notes say the reporting party could hear them

25   firing, never saw the gun; right?

1    A.  Yes, one of the notes does say that.

2    Q.  And then I guess it's still up on the -- is this still

3    up on the screen with you?

4              MS. SHNIDER:  Do you want me to go up --

5    A.  It's -- part of it.  I believe I have line 8.  I can see

6    from 8 and down.

7              MR. OLSON:  I'll just go up here.

8    A.  And I do have a copy myself, if not.

9              MS. SHNIDER:  There.

10   BY MR. OLSON:

11   Q.  All right.  That's what I -- and so, you know, we have

12   the first seven entries, and they come up to reporting party

13   never saw a gun; right?

14   A.  Correct.

15   Q.  That's Number 7.  And just to clarify what I was talking

16   about here, let's see if I can do this without -- like I

17   said, if you go over, there's timestamps on the left.  Like

18   I said, the first entry was 7:57, and then one of them said

19   -- that Number 7 there entry, looks like that's about at

20   8:00 a.m.; right?  With that one?

21   A.  The last entry --

22   Q.  Yeah.

23   A.  -- on that first page?

24   Q.  Yeah.

25   A.  Yes, where they can -- at 8:00 a.m., it would be where

```
1    he can hear him firing, never saw the gun.
2    Q.  Yeah.  I'll just call that Number 7 because that's how
3    it comes up on the comments; right?
4    A.  That works, yes.
5    Q.  That's kind of how the system puts this together.  Each
6    entry ends up getting a number associated with it.  So we
7    have -- 1, 2, 3, 4, 5, 6 -- 7 entries so far; right?
8    A.  Correct.
9    Q.  All right.  And then we -- is that right?  All right.
10   So where exactly are you at as we're getting to Entry Number
11   8?  The dispatch has said that three black -- "Three males
12   now," and then nine says, "Two black males, one
13   lighter-skinned male."  Where are you located?
14   A.  I am probably en route driving here I would guess.
15   Q.  Okay.  And then you said -- and then as you're driving
16   there -- I'm assuming as you're driving there and then you
17   are pulling into the river -- did you pull into the
18   Riverfront Park area?
19   A.  I did.  I would probably say that I arrived at that area
20   when it says that me -- it says 45105, that's my badge
21   number, and I'm --
22   Q.  What's the number associated with it, Number 15?
23   A.  I believe it's number -- line 15, yes, sir.
24   Q.  Okay.  And so consistent with line 15, where exactly are
25   you -- where do you think you're located there where the
```

1    dispatch then confirms?  You're 45105; right?

2    A.  That's correct.

3    Q.  All right.  And then you're "out with 2."  What does

4    that mean?

5    A.  Two subjects, probably.

6    Q.  Okay.  But you are alone?

7    A.  I'm alone in my squad at the time.  There is squads

8    behind me.  We all -- we were in a line going together on

9    35W.

10   Q.  Are you the first in the line?

11   A.  I am the first.

12   Q.  Okay.  And then so these -- we scroll down.  Now, is

13   this PowerLine Plate Check, is that the plate check of the

14   car that Mr. Childers was driving or is that the plate check

15   of that first car that you encountered?

16   A.  That would be not me running that plate.  It says 45159.

17   That would be Officer Jimenez who was running that plate.  I

18   believe that to be the vehicle that Mr. Childers was

19   driving.

20   Q.  Okay.  And Officer Jimenez was the first officer that

21   arrived on the scene and conducted the felony stop of the

22   car; right?

23   A.  He was probably.  I would say approximately three to

24   four other officers were with him.  We all literally showed

25   up together.  It was simultaneously to be honest with you.

1    I stopped out with that first car because it was the first

2    person I saw that was a white male in the area.  As I

3    stopped out with that car, I saw three males exiting that

4    wooded area, and I motioned to Officer Jimenez, and there

5    was probably three to four other squads behind him, to go

6    identify those three males because they matched the

7    description.

8    Q.  And how did you motion to them to do that?  Did you --

9    A.  I was outside of my vehicle.

10   Q.  Okay.  So you pointed over.  Did you point over to the

11   silver car?

12   A.  I pointed to the general area where they were walking

13   out on the path towards that car.

14   Q.  Okay.  Now, I'm just going to show you -- so number --

15   Number 15 was that -- that's got your mark, and over here if

16   you go over here, it's about 8 -- boy, wonder if I've got

17   this right -- about 8:05?

18   A.  Line 15, it looks like 8:05.

19   Q.  Okay.

20   A.  Yes.

21   Q.  Okay.  So the dispatch notes then said that --

22   identified the three people as stated in the dispatch notes.

23   The dispatch notes did not identify the car; right?

24   A.  Um, no, not initially.  There is dispatch notes though

25   now that once Officer Jimenez ran that plate and aired it,

1   it was ran and it comes back to -- if you look at line 22 --

2   Q.  Yeah, but before Jimenez came there and you called out

3   the felony stop, the car wasn't identified in the dispatch

4   notes; right?

5   A.  I did not call out the felony stop.  That was not my

6   role.

7   Q.  Well, you agree that Officer Jimenez conducted a felony

8   stop on the vehicle; right?

9   A.  I would, yes.

10  Q.  All right.  You didn't call out a felony stop, but you

11  advised the other officers to stop the car; right?

12  A.  I advised them to stop the three subjects that were

13  walking towards the vehicle.  There was three subjects

14  walking into the parking lot area.

15  Q.  Okay.

16  A.  And I motioned for them to stop out with those three

17  because they matched the individuals that were aired

18  initially in the call, and that the male I was out with was

19  not -- was unrelated.

20  Q.  Right.  And the three people then got into the silver

21  car; is that correct?

22  A.  By the time I motioned to Officer Jimenez to stop the

23  individuals, they got into that vehicle, correct.

24  Q.  All right.  And then in terms of the actual what we call

25  the felony -- Jimenez conducted a felony stop.  It's what

 1    you wrote in your report; right?

 2    A.  Correct.

 3    Q.  All right.  So in terms of the stop, it was basically --

 4    the car wasn't moving; right?

 5    A.  No.  It was parked.  It never moved.

 6    Q.  The car was parked.  It never moved.  But there was

 7    basically seize -- you know, seize the people, seize the

 8    car, stop the situation, and that's what Jimenez and the

 9    other officers did; right?

10    A.  Correct.

11    Q.  Okay.  And the -- the reporting parties never identified

12    the car associated with the three individuals; right?

13    A.  No.

14    Q.  All right.

15    A.  Not to my knowledge.

16    Q.  All right.  And so the -- your -- your request to stop

17    these individuals, which resulted in Jimenez conducting a

18    felony stop, was based on the match of the description of

19    the three people; correct?

20    A.  That, along with it was a weapon-related call in a park.

21    Q.  All right.  Now you didn't see any weapons on any of

22    these three people; right?

23    A.  Not at the time.

24    Q.  All right.  Now how far away from the three people were

25    you when you observed them?

```
 1    A.  I would say approximately 50 to 75 yards.

 2    Q.  Okay.  50 to 75 yards?

 3    A.  Possibly.  Actually, I probably couldn't conclude how

 4    far in feet or yards to be honest with you.  I observed a

 5    parking area from where I was at very clearly.

 6    Q.  Were you in the parking area?

 7    A.  Initially when I stopped that vehicle, I was on the side

 8    of the road that was adjacent to the parking area, yes.  And

 9    when I say "adjacent," if I can reference, it would be from

10    maybe one corner of the courtroom to the opposite corner of

11    the courtroom.

12    Q.  Okay.  So you're -- you're -- you stopped -- you're not

13    in the parking area, per se, but you've stopped --

14    A.  On the side of the road.

15    Q.  -- on the side of the road.  Was the car that you first

16    came up to and inquired of, is that car already stopped?

17    A.  Yes.

18    Q.  Okay.  And there was a person in the car; right?

19    A.  Yes.

20    Q.  So initially you went up to look to see if that car had

21    the suspect you were looking for; right?

22    A.  He exited the vehicle as I approached the car.

23    Q.  Okay.  And then you had a discussion with him; and then

24    as you're having that discussion, you saw the three people

25    come out of the woods; right?
```

1    A.  That's correct.

2    Q.  All right.  At the distance of 50 to 75 yards; right?

3    A.  Again, I probably couldn't be specific to how many yards

4    or feet.  I'm not terrific at math or distance.  That's why

5    I use the reference of the courtroom.

6    Q.  And, once again, then you -- you motioned to the other

7    officers.  And did you call out, you said, "Stop those

8    people" or something to that effect?

9    A.  I said, "Stop and identify the three subjects.  They

10   match the description."

11   Q.  And I'm going to show you -- have you -- have you looked

12   at the riverfront cameras before or have you looked at the

13   specific one --

14   A.  I've utilized them in different investigations.

15   Q.  Okay.  Well, I'm showing you what's been admitted as

16   Defendant's Exhibit 1.  This is a riverfront east camera.

17   Do you recognize that that's the riverfront area parking

18   lot?

19   A.  I do.

20   Q.  Now, I'm just -- maybe just to orient you, I'm going to

21   try and -- I'm going to move this if I can.  Okay.  So I've

22   stopped this at a minute and 3 and 37 seconds just as a

23   still shot.  And what we're looking at here is the

24   riverfront parking lot; right?

25   A.  A portion of it, yes.

1    Q.  A portion of it.  And the car that -- at issue in this

2    case is this silver car, I just put the cursor on it; is

3    that correct?

4    A.  It's slightly distorted, but I believe it to be that

5    vehicle, yes.

6    Q.  All right.  Then there's one, two, three, four -- I

7    mean, there's a number of cars in the parking lot at an

8    hour --

9    A.  Uh-huh.

10   Q.  -- by 8:00 in the morning; right?

11   A.  Correct.

12   Q.  Okay.  So because this is a still shot, I can't show

13   you, but where are you located if we were to use this as a

14   point of reference?

15   A.  I would not be in this capture.  I would be directly to

16   the right, so...

17   Q.  Okay.  Now this is Black Dog Road?

18   A.  That is Black Dog Road.  So where your cursor is, if

19   you --

20   Q.  You're down this way off the screen; right?

21   A.  Correct, yes.

22   Q.  All right.  So you're down that road the 50 to 75 yards;

23   right?

24   A.  I -- yeah.

25   Q.  All right.  But you are off --

```
1     A.  I'm off to the right.

2     Q.  But it's at -- and that's -- and then where in this

3     screen were these three people walking to and from?

4     A.  Not to and from, just from the wooded area.  So kind of

5     alongside where that restroom is right there, they were

6     walking towards the vehicle coming out in between -- between

7     that and I would say that pillar maybe.

8     Q.  Okay.  So they came from -- if we're looking at this,

9     they came --

10    A.  They came from that direction.

11    Q.  If we're looking at this, they came from the left?

12    A.  The left towards their vehicle, yes.

13    Q.  Okay.

14    A.  So walking towards their vehicle.  I could not indicate

15    exactly because there was some obstruction with some trees

16    here.  I saw the three subjects walking towards that

17    vehicle, but I couldn't say exactly where.

18    Q.  Okay.  And then just -- well, let's see here.  Okay.  So

19    I've just stopped this Defendant's Exhibit 1 at minute mark

20    it says 1 hour and 4 minutes and 25 seconds.  Okay?

21    A.  Okay.

22    Q.  Okay.  And at that point in time, we see -- what this

23    shows is that we see the first, actually, two squad cars

24    arrive; right?

25    A.  Correct.
```

1    Q.  We see the full squad car that basically it boxed in the

2    car more or less; right?

3    A.  Correct.

4    Q.  And that's -- it's there to conduct this felony stop;

5    right?

6    A.  Yes.

7    Q.  All right.  And now do you recall is that Jimenez in

8    that car?

9    A.  I believe that first squad would be Officer Jimenez.

10   Q.  And then there's a second squad.  And at that point in

11   time, they've conducted their felony stop; right?

12   A.  Yes.

13   Q.  And then did you see that the door is just opening to

14   this car?

15   A.  Yeah, he began to exit the vehicle per his report that I

16   reviewed prior to this.

17   Q.  Okay.  And that's where the -- the encounter more or

18   less starts there with the Jimenez car pulling up and the

19   door opening and Mr. Childers being confronted by the police

20   as he's sitting in the -- his car; right?

21   A.  I don't know he would be confronted.  He would be

22   ordered and directed out of that vehicle.

23   Q.  Ordered and directed out of the vehicle pursuant to the

24   high-risk felony stop situation; right?

25   A.  Yes.

1    Q.  Where he was told to, you know, show himself -- show

2    yourself, hands in the air, and then get on the -- get on

3    your knees and he was handcuffed behind his back; right?

4    A.  Yes.  I believe so.  I was not present during that.

5    Q.  All right.  You know, I mean, the officers followed that

6    procedure in this case?

7    A.  Yeah.

8    Q.  And actually did that for all three of the occupants;

9    right?

10   A.  That would be true.

11   Q.  And at that point in time, no officers had seen them in

12   possession of a gun; is that correct?

13   A.  I believe not.  I don't know what they had seen yet.

14   Q.  Well, you hadn't seen any guns?

15   A.  I had not.  I was not present there, though.  But, no, I

16   believe they wouldn't approach that vehicle to see anything.

17   Q.  Oh, in terms of, you know, the -- did you run a plate

18   check on that first car that you encountered?

19   A.  I don't believe I did because it's not in the CAD notes.

20   Typically I would do that, and I'm not sure if it didn't get

21   logged or if I may have ran it in my computer by myself.

22   Q.  And once you --

23   A.  I didn't air it if that's what you are asking me, no.

24   Q.  Okay.  And I can't remember what you said, but was the

25   person -- initially when you came upon that first car, was

 1     the person in the car and then got out?

 2     A.  He was exiting as I approached it.

 3     Q.  Okay.  And then did you get out of your car --

 4     A.  I did.

 5     Q.  -- to talk with him?

 6         As you were having a discussion with him, you saw the

 7     three people coming out of the wooded area?

 8     A.  True, yes, correct.

 9             MR. OLSON:  I have nothing further, Your Honor.

10             THE COURT:  Okay.  Thank you, Mr. Olson.

11             Ms. Shnider, do you have any redirect?

12             MS. SHNIDER:  I do not, Your Honor.

13             THE COURT:  All right.  Officer Huston, you may

14     step down.

15             THE WITNESS:  Thank you.

16             MS. SHNIDER:  And the Government is going to now

17     call Officer Rick Porras.

18             THE COURT:  Okay.

19             MR. OLSON:  I'll just...

20             THE COURT:  Okay, Officer Porras, if you want to

21     come up, I will swear you in.  And I am -- if you would like

22     to take off your mask while testifying, that is fine with

23     the Court.

24             THE WITNESS:  Thank you.

25             THE COURT:  Okay.  All right.  Could you go ahead

```
 1   and state your full name and spell your last name, please?

 2              THE WITNESS:  First name is Rick, last name is

 3   Porras spelled P-, as in Paul, o-r-r-a-s.

 4              THE COURT:  Okay.  Thank you.  And if you could

 5   raise your right hand.

 6        (Witness Sworn.)

 7              THE COURT:  Thank you.  And you may sit down.

 8              Ms. Shnider.

 9              MS. SHNIDER:  Thank you, Your Honor.

10                        (Rick Porras)

11                      DIRECT EXAMINATION

12   BY MS. SHNIDER:

13   Q.  All right.  Officer Porras, you are also employed by

14   Burnsville Police Department; right?

15   A.  Yes, ma'am.

16   Q.  How long have you been there?

17   A.  Since July 10th of 1995.

18   Q.  And I'm guessing you've had many different roles there.

19   Why don't you just summarize some of the stuff you've done

20   there?

21   A.  Currently I'm assigned to the patrol division, which is

22   when I started, I had that role.  I've been a narcotics --

23              THE COURT REPORTER:  Can you pull that microphone

24   closer to you?

25              THE WITNESS:  Yes, ma'am.  I can move up too.  Is
```

1    that better?

2               THE COURT REPORTER:  I don't know if it's working.

3               MS. SHNIDER:  Is it on?  Is the green light on?

4               THE WITNESS:  Yes.

5               MS. SHNIDER:  Okay.

6               THE COURT:  I think just make sure you're close to

7    the microphone because we have a protective cover on it,

8    so --

9               THE WITNESS:  Yes, ma'am.

10              THE COURT:  Thank you.

11              THE WITNESS:  I've been on our crime scene team as

12   a physical evidence officer.  I was on our emergency action

13   group, which is commonly referred to as a SWAT team.  I was

14   a sniper on that SWAT team.  I also was a commander of that

15   SWAT team for a short period of time.  I'm currently a field

16   training officer.  I'm on our peer support team.  I've been

17   on a drug task force for numerous years for Dakota County

18   and also been on the Burnsville street crimes unit.

19   BY MS. SHNIDER:

20   Q.  So as of July 2020, was your role patrol officer at that

21   time?

22   A.  Yes.

23   Q.  Were you on duty the morning of July 25th, 2020?

24   A.  Yes, I was.

25   Q.  Did you respond to a shots fired call?

```
 1    A.  I did.

 2    Q.  Where did you report to?

 3    A.  Where was the call at?

 4    Q.  Yeah, what location did you respond to?

 5    A.  It was at Minnesota Riverfront Park off of Black Dog

 6    Road and 35W.

 7    Q.  And so when you're heading over there, you're getting

 8    information about what's going on from dispatch in your

 9    squad?

10    A.  Yes.

11    Q.  And that would come in over a computer but also over the

12    radio?

13    A.  Yes.

14    Q.  When you arrived on the scene, what information did you

15    understand generally about what had happened?

16    A.  Well, when I arrived on scene, my partners had arrived

17    earlier than I did.  And so based on what I have seen, when

18    I arrived, they were doing a high-risk stop.

19    Q.  And what was the preceding incident that had given rise

20    to the stop in your understanding?

21    A.  That my partners had identified persons that were likely

22    involved in the shooting -- or the shots fired.

23    Q.  And so what happened when you first pulled in?

24    A.  When I pulled in, I noticed that there was a high-risk

25    stop, also known as a felony stop, that was in progress.
```

```
1     Mr. Childers was being placed in handcuffs by Officer Tim

2     Swope.

3     Q.  And what did -- what did you do then?

4     A.  So I arrived behind Officer Swope and said that I would

5     take control of Mr. Childers.

6     Q.  And we've heard a little bit about this already, but

7     standard procedure in a high-risk stop is to cuff the

8     occupants of the vehicle?

9     A.  Yes, ma'am.

10    Q.  And what's the reason for that?

11    A.  You know, the stop, high-risk stop, kind of explains

12    itself.  However, especially for this incident, when there's

13    reports of shots fired, even -- we don't want people to have

14    freedom of movement with their hands in case there is a

15    firearm on them or anything else that could hurt themselves

16    or one of my partners or myself.

17    Q.  And so it sounds like your role, once you got there, was

18    to secure Mr. Childers; correct?

19    A.  Yes.

20    Q.  And so at that -- at the time he was handed off to you,

21    did you believe he could be armed and dangerous?

22    A.  Absolutely.

23    Q.  And so describe the procedures you employed after he was

24    handed off to you.  We'll watch your body cam in a second.

25    A.  Okay.  So once I brought him away from where the
```

1    high-risk stop was continuing, and -- I began to pat him

2    down.  First, if I can go back, he had questions as to why

3    we were stopping him, and I was trying to explain to him why

4    we were stopping him and what the call was about.

5    Q.  Okay.  And then you said you performed a pat search?

6    A.  Yes.

7    Q.  And, first of all, what are you looking for when you are

8    doing a pat search?

9    A.  I'm looking for anything that might hurt myself or my

10   partners, hard objects.  In this case, it was a shots fired

11   call, so I'd be looking for guns, gun parts, or ammunition.

12   Q.  And so describe the process you used to perform a pat

13   search.

14   A.  So -- again, so he was handcuffed, and I would start at

15   the immediate areas where he would have access to, the

16   waistband and the pockets.  So I started with the pockets,

17   and in his right pocket I felt on the outside and I could

18   tell that he had ammunition in his pockets.  I'm very

19   familiar with what those feel like, and they were in a --

20   like a bandanna or a kerchief and so they were loose, and so

21   I was able to identify that, that he had those.  So I pulled

22   those out.

23   Q.  Okay.  So you felt his pockets?

24   A.  Uh-huh.

25   Q.  You could feel there was something loose in there that

1     you recognized as ammunition?

2     A.  Yes.

3     Q.  And so then you pulled it out of his pocket?

4     A.  I pulled them out, and I alerted my officers that he had

5     ammunition, which would indicate to them, if I were in their

6     shoes, that there's very likely a gun in place somewhere.

7     Q.  Okay.  All right.  Let's just watch a clip of your body

8     cam.

9     A.  Sure.

10    Q.  It's going to be a little bit longer, it's about six

11    minutes, just so we sort of see soup to nuts here, and I'll

12    pause it a couple times to talk a little bit.

13    A.  Okay.

14        (Video played)

15    BY MS. SHNIDER:

16    Q.  So at the start here, this is you walking up?

17    A.  Yes, it is.  Yes, it is.

18        (Video played)

19    BY MS. SHNIDER:

20    Q.  All right.  So I'm just pausing it here at about a

21    minute 26.  So as you said, he was asking why we were

22    stopped and you were explaining to him why; right?

23    A.  Yeah.

24    Q.  And you were saying, "Look, we're figuring out what's

25    going on.  If you have nothing to do with it, you're going

1    to be free to go"; right?

2    A.  Yes.

3    Q.  And explain what was happening with his pants and his

4    sort of lower body there.

5    A.  He had baggy pants on, and he said he was trying to pull

6    up his pants so they wouldn't fall down.  I also didn't want

7    him to reach into his waistband for anything.  Even though

8    he was handcuffed, there could be a multitude of things that

9    could be in a waistband.  He can also reach around.  And so

10   I was just telling him to not go into his pants, and he told

11   me that, as you heard, that he was just keeping his pants

12   up.

13   Q.  Did he have a couple layers of clothing on too on the

14   bottom?

15   A.  Yes, he had his outer pants; and then on the inside, I

16   later found that there was gray sweat shorts.

17   Q.  Okay.

18       (Video played)

19   BY MS. SHNIDER:

20   Q.  So you explained to him there, "I'm going to pat you

21   down"?

22   A.  Yes.

23       (Video played)

24   BY MS. SHNIDER:

25   Q.  And so at some point we see you take a phone out of his

1    pocket.  At what point in relation to that did you feel that

2    he had those bullets in his pocket?

3    A.  It was when -- right at this moment here.  You can see

4    me on the outside of his pockets.

5    Q.  Okay.

6        (Video played)

7    BY MS. SHNIDER:

8    Q.  Okay.  And so we hear you then called it out to your

9    colleagues that you had found the ammunition?

10   A.  That's correct, yes.

11   Q.  And, I'm sorry, I may have said this before.  I can't

12   remember.  What are the types of things that a person can

13   have on them that can be dangerous during a situation like

14   this?

15   A.  There could be lots of things.  Again, with this

16   particular call, specifically a gun, but there could be

17   knives, there could be needles if he's a drug user.  There

18   could be homemade weapons, there could be razor blades,

19   there could be all sorts of things.

20   Q.  So are you feeling things from the outside that you're

21   then needing to inspect to ensure whether or not they're

22   dangerous?

23   A.  Yes.

24       (Video played)

25   BY MS. SHNIDER:

1    Q.  What was that you just picked up from the ground?

2    A.  That was a round of ammunition.

3    Q.  Where was that?

4    A.  It was on the ground.

5    Q.  Oh, had it maybe fallen or something or did you --

6    A.  It may have fallen from the kerchief just because that

7    wasn't a secure bag or box that they usually come in.

8    Q.  Okay.  And then that was sort of our first glimpse, you

9    leaned forward far enough that we could sort of see you

10   going down his legs and then kind of patting and feeling;

11   right?

12   A.  Uh-huh.

13       (Video played)

14   BY MS. SHNIDER:

15   Q.  So at that point could you sort of feel he had something

16   and you were -- you could recognize it as a bubble pipe?

17   A.  Yes.

18   Q.  And you were trying to figure out where in his layers it

19   was?

20   A.  Yes.

21       (Video played)

22   BY MS. SHNIDER:

23   Q.  So there he was saying, "I want to make sure I don't

24   lose my money or my phone"?

25   A.  That's correct.

```
 1    Q.  And you we're saying, "We're recording this.  We're not

 2    stealing anything from you"?

 3    A.  That is correct.

 4        (Video played)

 5    BY MS. SHNIDER:

 6    Q.  Okay.  So it sounds like he was visibly sweating?

 7    A.  Yes.

 8    Q.  And he said, "I'm really hot"?

 9    A.  Yeah.

10    Q.  And you asked him, "Did you ingest" -- glass is

11    methamphetamine; right?

12    A.  That is correct.

13    Q.  And he said, "Three or four minutes ago"?

14    A.  I believe he said -- I'd have to listen to it again -- I

15    believe when we rolled up.

16    Q.  And so what -- what protocols does that trigger for you?

17    A.  It suddenly becomes a medical situation.  I don't want

18    him to have an overdose in police custody.  So I had my

19    partner call for medics right away.

20    Q.  Okay.

21        (Video played)

22    BY MS. SHNIDER:

23    Q.  Okay.  That's all we're going to -- so we notice that as

24    you're coming away there, one of your colleagues says they

25    just found a gun under the driver's seat?
```

1   A.  That was my supervisor, yes.

2   Q.  Okay.  Just one moment.  All right.  I want you to

3   indulge a hypothetical for me for a moment.  Say for

4   whatever reason when Mr. Childers had been handed off to you

5   for whatever reason let's say you didn't search him, you

6   didn't talk to him, you just said, "Have a seat on the curb

7   while we figure this out."  You with me?

8   A.  Yes.

9   Q.  As far as you know, some of your other colleagues were

10  still going to look in the car for a gun; right?

11  A.  Yes.

12  Q.  And what would have happened once that gun was found

13  under the driver's seat?

14  A.  Well --

15              MR. OLSON:  Objection, objection, speculative.

16              THE COURT:  The objection is overruled.

17  BY MS. SHNIDER:

18  Q.  Go ahead.

19  A.  What would have happened is Mr. Childers would have

20  still been put in the backseat of my car.  Just because of

21  the seriousness of the incident, we would want the occupants

22  to be separate and not have an opportunity to look at each

23  other or speak with each other.  If he would have -- if

24  there would have been no questions or discussion, I would

25  have called for my dispatcher to run a criminal history.

1    Because of the ammunition that was found and the gun later,

2    I would have wanted to have seen if he was a convicted

3    felon.

4    Q.  Okay.  And so in my hypothetical, you didn't find the

5    ammunition, but you would have done that when the gun was

6    found?

7    A.  Yes.

8    Q.  Is that standard practice when a firearm is found to

9    figure out if any of the individuals are prohibited?

10   A.  Yes.

11   Q.  And so even if he hadn't told you he was a felon, that

12   was information you could access in your squad?

13   A.  Yes.

14   Q.  And once you had a gun and confirmed his criminal

15   history, would he have been placed under arrest?

16   A.  Yes.

17   Q.  And would you have done a comprehensive search of his

18   person incident to arrest?

19   A.  At the station.

20   Q.  Okay.

21             MS. SHNIDER:  Your Honor, that's all I have on

22   direct for this witness.

23             THE COURT:  All right.  Thank you.

24             Mr. Olson.

25

**CROSS-EXAMINATION**

BY MR. OLSON:

Q.  Okay.  So, Officer Porras, you were working a patrol

shift on July 25th when you got this report of the shots

fired and this is how your involvement in this case started;

right?

A.  Yes, sir.

Q.  And were you -- were you out in your own patrol car at

that point in time?

A.  I was by myself in my patrol car, yes, sir.

Q.  Okay.  And then you arrived into the parking lot of the

river -- the parking lot of the Riverfront Park; right?

A.  Yes, sir.

Q.  And when you arrived, there was already a number of

officers on the scene; right?

A.  Yes, sir.

Q.  And they had already conducted the felony stop; right?

A.  It was still in progress, sir, yes.

Q.  Okay.  Well, you arrived to a felony stop in progress?

A.  Yes.

Q.  Accurate?

    So the other officers had stopped or moved in on the

car; right?

A.  Yes, sir.

Q.  All right.  And then you walked up to the other officers

1    and observed that Mr. Childers was being detained pursuant

2    to the high-risk stop; right?

3    A.  Yes, sir.

4    Q.  Other officers -- I think you said it was -- was it --

5    is it Swope or Swoop?

6    A.  Swope.

7    Q.  Swope had secured Mr. Childers; right?

8    A.  Yes, sir.

9    Q.  And when I say "secured," he had handcuffed him behind

10   his back; right?

11   A.  Yes.

12   Q.  Mr. Childers was knee down on the pavement at that

13   juncture; right?

14   A.  Yes.

15   Q.  And a number of squads were in the vicinity; right?

16   A.  Yes.

17   Q.  Various officers were near Mr. Childers and otherwise

18   located in the parking lot; right?

19   A.  That is correct.

20   Q.  And officers, because it was a high-risk situation, they

21   had their guns drawn; right?

22   A.  Yes.

23   Q.  All right.  Did you have your gun drawn?

24   A.  I did not.

25   Q.  All right.  That's because you could see the other

1    officers already had a person that was being detained and

2    cuffed; right?

3    A.  Yes, sir.

4    Q.  All right.  And then, you know, the long and short of it

5    is that you weren't involved in the initial stop or the

6    handcuffing of Mr. Childers; right?

7    A.  That's correct.

8    Q.  I mean, you weren't involved in identifying him as a

9    suspect at all; right?

10   A.  I was not.

11   Q.  You just took -- you just took it from there; right?

12   A.  I'm sorry, sir?  Took -- took it --

13   Q.  I said you just took over control from there; right?

14   A.  Of Mr. Childers, yes, sir.

15   Q.  Mr. Childers.

16       And as you indicated in your report, after Officer Swope

17   placed Childers in handcuffs, Childers were handed off to me

18   for a search; right?

19   A.  Yes, sir.

20   Q.  And then you indicated that you brought Childers back to

21   a squad car and I searched him; right?

22   A.  Yes, sir.

23   Q.  Essentially that's what happened.  He got turned over to

24   you for a search; right?

25   A.  Yes, sir, a pat-down.

1    Q.  All right.  Okay.  And then we -- on your -- you've got

2    your body cam activated at that point in time, and we see on

3    the video we've seen that you escorted him over to the side

4    of your squad car to pat him down; right?

5    A.  Yes, sir.

6    Q.  All right.  And during the course of your encounter with

7    him, you asked him some questions; right?

8    A.  I did.

9    Q.  You had an ongoing dialogue.  You asked him questions,

10   he gave you some responses; right?

11   A.  Yes.

12   Q.  He was handcuffed during the entire encounter; right?

13   A.  Yes.

14   Q.  Surrounded by a number of officers with their guns

15   drawn; right?

16   A.  We were away from the officers that had their guns

17   drawn.  We were -- I'd have to look at the video, but from

18   where I patted him down, the activity was in front of us.

19   No one had their guns drawn at him at that time.

20   Q.  Okay.  Well, when you took custody of this person who

21   was knees down on the pavement and handcuffed, there were a

22   number of officers with their guns drawn at that time;

23   correct?

24   A.  Yes, sir.

25   Q.  You took him over to your squad car, engaged in some

1   dialogue with him, and you patted him down; right?

2   A.  Yes, sir.

3   Q.  And during the course of that encounter, you asked him

4   some questions; right?

5   A.  I did.

6   Q.  And at no point in time did you read him his Miranda

7   rights; right?

8   A.  I did not.

9   Q.  Okay.  So you -- we saw on the video that as you were

10  talking with Mr. Childers, the two of you had a discussion

11  about the -- about the merits of you doing this Terry

12  pat-down search; right?

13  A.  Yes, sir.

14  Q.  And he had some -- he had some questions about you doing

15  that.  You told him what you were going to do, and then you

16  patted him down; right?

17  A.  Yes, sir.

18  Q.  Just in terms of the pat-down search, your pat-down

19  search started with patting -- with an examination of his

20  front right pocket; right?

21  A.  Yes, sir.

22  Q.  That's where you started it; right?

23  A.  Yes.

24  Q.  And you put your hand in his pocket; right?

25  A.  After I patted the outside of his pocket, yes.

```
1    Q.  Okay.  And, first of all, you grabbed a cell phone?

2    A.  Yes, when I went into his pocket, the first thing I

3    pulled out was a cell phone.

4    Q.  Okay.  You pat him down, you grab a cell phone.  And

5    then after getting a cell phone out, then you put your hand

6    back in the pocket a second time; right?

7    A.  Yes.  I'd have to review my video, sir, to see if I went

8    on the outside again to feel the kerchief that had the

9    rounds of ammunition.

10   Q.  We can take a look at that but just a second.  And at

11   least after the phone is out, then you either did another

12   pat-down, but you ended up you put your hand back in his

13   pocket a second time?

14   A.  Yes, sir.

15   Q.  All right.  And that's where you grabbed his bandanna

16   and you pulled the bandanna out; right?

17   A.  Yes.

18   Q.  You pulled the bandanna out and you asked him, "What's

19   this?"  You asked him what it is; right?

20   A.  I believe I asked him if there was anything illegal in

21   there.

22   Q.  Okay.  And that's when he said -- well, we'll look at

23   it, but he said there was bullets in there; right?

24   A.  I believe so, yes, but I would need to review it.

25   Q.  We can just clarify that.  And then the long and short
```

1    of it is after that, you called out to the officers; right?

2    A.  Yes.

3    Q.  At that point in time, the other officers were searching

4    the car; right?

5    A.  I don't know what they were doing.

6    Q.  You weren't involved in the car search; correct?

7    A.  That's correct, sir.

8    Q.  All right.  Let's go back here.  Let's see.  We'll just

9    see if we can...

10        (Video played)

11   BY MR. OLSON:

12   Q.  Yeah.

13        (Video played)

14   Q.  Now that clarifies, so you'd gone -- did you go into his

15   pockets twice then?

16   A.  In terms of what, sir?  I'm sorry.  I don't understand

17   the question.

18   Q.  So you had gone -- you had already --

19   A.  I pulled out the cell phone.

20   Q.  Yeah.

21   A.  And then I came back, and I can't tell if I went into

22   the pocket or if I felt the outside, but I felt the rounds

23   the first time when I pulled out his cell phone.

24   Q.  Okay.  And then we can see here that you're just -- you

25   just pulled out the handkerchief right here; right?

1   A.  Yes, sir, yeah.

2   Q.  And you are about to bring it up in the air; right?  We

3   just get to see what the conversation is, okay.

4       (Video played)

5   BY MR. OLSON:

6   Q.  Yeah, so when you pulled that bandanna out, you asked

7   him if there's anything in here that's illegal; correct?

8   A.  Uh-huh, yes, sir.

9   Q.  And then he just said, "We found -- we just found this."

10  He said there were bullets in it.  During the course -- is

11  that correct?

12  A.  Yes, that's correct, sir.

13  Q.  All right.  And then during the course of your encounter

14  with him, he explained to him -- he explained to you that

15  they had found the bullets, he indicated over there on the

16  ground; right?

17  A.  Yes.

18  Q.  And then you asked him some questions about you wanted

19  to know, you know, whether he had a gun, where's the gun,

20  and you asked him those kinds of questions; right?

21  A.  I asked him those questions.

22  Q.  All right.  And he said he didn't have a gun; right?

23  A.  He did.

24  Q.  Told you there was not a gun in the car; correct?

25  A.  Yes.

1    Q.  And just to clarify something, this -- during the course

2    of your pat-down, then you pulled a pipe out of his -- let's

3    see what did you say?  You -- you found a meth pipe in his

4    pockets; is that correct?

5    A.  Yes.  If I may, I found a marijuana pipe first.

6    Q.  You found a marijuana pipe, and you said you weren't

7    interested in that; right?

8    A.  That's correct.

9    Q.  Then you found the meth pipe, and that was clean; right?

10   A.  Yes.

11   Q.  In other words, it was clean; right?

12   A.  There was no residue or meth in that pipe, correct, sir.

13   Q.  And that really wasn't your focus at the moment; right?

14   A.  It was not.

15   Q.  Okay.  And then after you -- you ended up then you put

16   Mr. Childers in your squad car; correct?

17   A.  Yes, sir.

18   Q.  And then as you -- once you had finished up with him,

19   when you were walking away at the end of the video, it shows

20   another officer came over and told you that they had found a

21   gun in the car; is that correct?

22   A.  That is correct.

23   Q.  That happened after you had placed him in the squad car;

24   right?

25   A.  That is correct, sir.

1          MR. OLSON:  Just a half second.

2          Nothing further, Your Honor.

3          THE COURT:  Thank you.

4          Any redirect?

5          MS. SHNIDER:  Just very briefly.

6                    **REDIRECT EXAMINATION**

7    BY MS. SHNIDER:

8    Q.  I know the video doesn't sort of capture everything that

9    you were doing, Officer Porras.  Just to clarify, the first

10   time you detected that he had bullets in his pocket, what

11   were you doing?

12   A.  I was doing a pat-down.

13   Q.  So you felt them from the outside?

14   A.  Yes.

15   Q.  And was that before you had gone in his pockets?

16   A.  Yes.

17          MS. SHNIDER:  Okay.  That's all.  Thank you,

18   Your Honor.

19          THE COURT:  Okay.  Thank you.

20          Mr. Olson, any recross?

21          MR. OLSON:  No, Your Honor.

22          THE COURT:  All right.  You may step down, sir.

23   Thank you.

24          THE WITNESS:  Thank you.

25          MS. SHNIDER:  And the Government's final witness

```
 1     will be Officer William Berg.
 2                 THE COURT:  Okay.
 3                 Officer Berg, if you want to come on up to the
 4     witness stand, and then I will put you under oath.
 5                 And you may remove your mask or leave it on while
 6     you testify.
 7                 THE WITNESS:  Okay.  Thank you.
 8                 THE COURT:  Okay.  Thank you.  If you could raise
 9     your right hand, please -- oh, I'll let you put that away.
10     All right.
11         (Witness Sworn.)
12                 THE COURT:  Thanks.  And if you could sit down and
13     then state your full name for the record?
14                 THE WITNESS:  Okay.  My name is William Eric,
15     E-r-i-c; Berg, B-e-r-g.
16                 THE COURT:  All right.  And I'll let the
17     examination begin.  Just a reminder that because we have a
18     protective cover on the microphone, you might have to get
19     right up to it like I do.  I'm sorry.  Thank you.
20                 THE WITNESS:  All right.
21                 THE COURT:  Ms. Shnider.
22                 MS. SHNIDER:  Thank you, Your Honor.
23
24
25
```

```
 1                    (William Eric Berg)

 2                   DIRECT EXAMINATION

 3     BY MS. SHNIDER:

 4     Q.  All right.  Officer Berg, you are also with the

 5     Burnsville Police Department; correct?

 6     A.  I am.

 7     Q.  And why don't you give us a high level of your

 8     background in law enforcement?

 9     A.  So I started as a police officer with the

10     Charlotte-Mecklenburg Police Department in Charlotte, North

11     Carolina, in 2010.  Was there like about four and a half

12     years.  Then transferred to the Burnsville Police

13     Department, and have been with Burnsville since then.  At

14     Burnsville, I'm -- aside from being a patrol officer, I'm

15     also a physical evidence officer, so I process crime scenes

16     and deal with evidence-related matters.

17     Q.  So you have both ordinary patrol duties but then also

18     evidence collection duties?

19     A.  Yes.

20     Q.  And so if you are on the scene of, oh, say a traffic

21     stop and evidence needs to be collected, if you are there,

22     you'll take the lead on something like that?

23     A.  Typically, yes.

24     Q.  Okay.  Were you on duty on the morning of July 25th,

25     2020?
```

1    A.  I was.

2    Q.  Did you respond to a shots fired call a little before

3    8:00 a.m.?

4    A.  I did.

5    Q.  And did you head over to the -- where was the reported

6    location?

7    A.  It was Minnesota Riverfront Park off of Black Dog Road.

8    Q.  And so did you head over there?

9    A.  I did.

10   Q.  And when you were arriving over there, what generally

11   did you understand had taken place?

12   A.  Based on my understanding that somebody had called and

13   reported that an unknown party had been firing a gun near

14   the banks of the river in that park there.

15   Q.  And so when you got on the scene, what was happening?

16   A.  When I arrived, I was actually with another officer who

17   I was training at the time who was driving.  We arrived and

18   Officer Jimenez was initiating a stop on the vehicle in the

19   parking lot, and so we went to assist him with that.

20   Q.  And so were you hearing -- as you were headed over

21   there, hearing information over your radio too?

22   A.  Yes.

23   Q.  So when you got there, did you generally understand that

24   they were stopping individuals who they were believed to be

25   involved in the reported shooting incident?

```
 1    A.  Yes.
 2    Q.  Okay.  And so what was -- we'll watch your body cam in a
 3    second here, but what was your role after you exited your
 4    vehicle?
 5    A.  After I exited my vehicle, I assisted Officer Jimenez
 6    with the high-risk traffic stop, so basically just providing
 7    cover as the people were removed from the vehicle.  And then
 8    after everybody had been removed from the vehicle and
 9    detained, myself and some other officers approached the
10    vehicle just to ensure that there was nobody else inside the
11    car that was hiding or anything like that.
12    Q.  And then after you cleared it for other occupants, what
13    did you do?
14    A.  At that point, I initiated a protective sweep of the
15    vehicle looking for weapons based on the information that we
16    had, given that a gun had been fired, and also when I --
17    prior to approaching the vehicle, I'd been informed by
18    another officer that bullets had been found in the pocket of
19    one of the occupants of the vehicle.
20    Q.  And so is it fair to say that when you were approaching
21    the vehicle initially, it was still kind of a fluid
22    situation?  It wasn't clear if people were going to be
23    arrested or what was going to happen?
24    A.  Yeah, very much a fluid situation.
25    Q.  Okay.  And based on the facts that you had, did you
```

1    believe that the persons who had been ordered out of the car

2    could be armed either on their persons or in the vehicle?

3    A.  Yes.

4    Q.  Okay.  And where are places in a vehicle when you are

5    doing a sweep for weapons that -- where weapons may be

6    commonly stored?

7    A.  They are often found underneath one of the seats, one of

8    the front seats, sometimes between a seat and the center

9    console, or also could be in the center console or glove box

10   area.

11   Q.  Okay.

12   A.  Those are the main areas that we find them.

13   Q.  All right.  We're just going to watch a couple of clips

14   here of your body cam.

15   A.  Okay.

16   Q.  I'm just going to start at the beginning and show a

17   little bit of when you first rolled up.

18   A.  Okay.

19   Q.  I'm starting about 20 seconds here.

20       (Video played)

21   BY MS. SHNIDER:

22   Q.  Okay.  So I'm stopping it here at about a minute 12.  Is

23   that your colleague Officer Jimenez?

24   A.  It is, yeah.

25   Q.  And he's saying, "We got a call of some people firing

```
1   off the guns, so we're figuring it out, we're going to order
2   you out one at a time"; right?
3   A.  Yes.
4   Q.  Okay.  And you were standing there kind of on the
5   opposite side of Officer Jimenez's vehicle?
6   A.  Yes, yes.
7   Q.  Okay.  Then I'm going to skip to about 4 minutes and
8   20 seconds.
9   (Video played)
10  BY MS. SHNIDER:
11  Q.  So we can hear there it was relayed to you that
12  ammunition was found in somebody's front pocket?
13  A.  Yes.
14  Q.  Okay.  Now I'm going to do the search, so I'm going to
15  start it at about 5 minutes and 30 seconds.  And this is
16  Government's Exhibit 3.  Sorry.  I don't know if I ever said
17  that.
18  (Video played)
19  BY MS. SHNIDER:
20  Q.  So is this portion where you are just clearing it for
21  other occupants?
22  A.  Yes.
23  Q.  And would that typically involve looking in the trunk?
24  A.  Yes.
25  (Video played)
```

 1    BY MS. SHNIDER:

 2    Q.  Okay.  So what -- we could hear you and your colleagues

 3    sort of talking in the background there.  It sounded like he

 4    sort of was like, "Okay, so are we going to search it?"  And

 5    you were like, "Let's just look for the gun first, let's

 6    look in common gun places"; is that right?

 7    A.  Uh-huh, yes.

 8    Q.  And then you sort of looked in the console and kind of

 9    the areas right around the driver's seat?

10    A.  Yes.

11    Q.  Or not in the console but kind of in between it?

12    A.  Yes.

13    Q.  And then you looked under the seat and observed a

14    firearm?

15    A.  Yes.

16    Q.  And cool as a cucumber announced that to your

17    colleagues?

18        Ultimately, how many handguns were found under the

19    driver's seat?

20    A.  A total of two.

21    Q.  And after those were found, did you then collect those

22    guns?

23    A.  I did, yeah.

24    Q.  So you went through the procedures of putting on new

25    gloves and all that stuff?

1    A.  Yes.

2    Q.  And ultimately did you or other officers then conduct a

3    more thorough search of everything in the car?

4    A.  We did, yes.

5    Q.  And was the car towed at some point?

6    A.  I believe it was.

7    Q.  And once you were done dealing with the guns in the car,

8    how did your kind of involvement on the scene end?

9    A.  I think -- at that point once the guns had been

10   collected, myself and Officer Swope, who was the officer

11   that was with me that day, we just -- we took those guns

12   back to the Burnsville Police Department and just packaged

13   them and submitted them to our evidence department -- or

14   evidence unit of our property.

15   Q.  Before that, did you also help with some shell casings?

16   A.  Yeah, that is correct.  Somebody -- I don't remember

17   which officer, but they indicated that some shell casings

18   had been found near the bank of the Minnesota River, so I

19   proceeded to that area, which was a short walk from the area

20   where the stop occurred, and located, I believe it was four

21   shell casings and a spent projectile as well that was on the

22   bank of the river.

23   Q.  And then you went back to the station --

24   A.  Yes.

25   Q.  -- and that sort of concluded your involvement on the

DIRECT EXAMINATION OF WILLIAM EDWARD BERG

1    scene?

2    A.  Yes.

3              MS. SHNIDER:  All right, Your Honor, that's all I

4    have for direct.  Thank you.

5              THE COURT:  All right.  Thank you.

6              Mr. Olson, your cross-examination.

7                        **CROSS-EXAMINATION**

8    BY MR. OLSON:

9    Q.  So, Officer Berg, when you arrived at the Riverfront

10   Park on the morning of July 25th, the other officers had

11   already conducted a felony stop of the vehicle in question;

12   right?

13   A.  They were just initiating it, yes.

14   Q.  Okay.  And that's -- were you the second squad car into

15   the parking lot then?

16   A.  I don't remember which order, but it was one of the next

17   ones in after Officer Jimenez.  I don't remember if it was

18   the second or third, but it was pretty soon after he

19   arrived.

20   Q.  You arrived in your squad car and Jimenez was in front

21   of you; right?

22   A.  Yes.

23   Q.  All right.  And then you -- I think you described that

24   you -- you came up to the passenger door of Jimenez's squad

25   and you provided cover; correct?

```
1    A.  Yes.

2    Q.  All right.  In other words, you drew your gun, put your

3    gun drawn on the suspect car; right?

4    A.  Yes.

5    Q.  In terms of this being the suspect car, you were

6    involved in identifying -- or identifying this suspect car;

7    right?

8    A.  I was not, no.

9    Q.  You -- it was already identified by other officers.  You

10   were just involved in assisting at the scene when you showed

11   up; right?

12   A.  Correct.

13   Q.  And in terms of your body cam, it's Officer Jimenez

14   which is calling out the commands to the occupants of the

15   car; right?

16   A.  It is.

17   Q.  And you and the other officers have your guns drawn;

18   right?

19   A.  Yes.

20   Q.  Right.  Then Mr. Childers was ordered out of the car;

21   right?

22   A.  Yes.

23   Q.  Got on his knees and was handcuffed and taken away by

24   Officer Porras; right?

25   A.  As far as I know, yeah.
```

```
 1    Q.  And there was a couple other occupants in the car;
 2    right?
 3    A.  Correct.
 4    Q.  And the same thing proceeded to happen with the two
 5    other occupants; right?
 6    A.  Correct.
 7    Q.  They got out, hands in the air, were ordered on the
 8    pavement and cuffed; right?
 9    A.  Correct.
10    Q.  And detained and taken to their separate squad cars;
11    right?
12    A.  Yes.
13    Q.  So after the occupants were out, you and Officer Swope
14    conducted a search of the interior of the vehicle; right?
15    A.  Correct.
16    Q.  All right.  And that's basically what your involvement
17    was here is that after the occupants were detained, you and
18    Swope conducted a search of the interior of the vehicle;
19    right?
20    A.  Yes.
21    Q.  All right.  So just -- I'll try not to spend too much
22    time with this, but back to Government Exhibit 3.  I'm just
23    going to show you something at the very beginning.  I'll
24    just stop it.  I've got this here at 49 seconds.  And this
25    is your body camera; right?
```

```
 1    A.  It is.
 2    Q.  And you can see through the -- between where the
 3    passenger side door of the Jimenez squad car is where you
 4    are located; right?
 5    A.  Yes.
 6    Q.  And your body is aiming with your body camera at the
 7    silver car; right?
 8    A.  Yes.
 9    Q.  And there's a person who's sitting in the driver's seat;
10    right?
11    A.  Yes.
12    Q.  Got his hands up in the air; right?
13    A.  Partially, yes.
14    Q.  Partially.  That's Mr. Childers; right?
15    A.  Yes.
16    Q.  And that's kind of where this encounter started was he
17    was in the squad and then he gets ordered out by Officer
18    Jimenez; right?
19    A.  Yes.
20    Q.  We'll just see -- we'll just take a look at those few
21    seconds here, okay?
22    (Video played)
23    BY MR. OLSON:
24    Q.  Okay.  So the encounter starts.  You come up to the --
25    Jimenez' car and you look -- you looked over at the silver
```

```
 1    car; right?
 2    A.  Yes.
 3    Q.  And did you see the door open up or was the door already
 4    open when you got there?
 5    A.  I don't remember if the door was open or not.
 6    Q.  But then the driver, you know, puts his body -- faces
 7    towards Jimenez, and then he eventually complies with his
 8    commands, puts his hands up, and then Jimenez tells him what
 9    he's going to do and then he comes up and he gets handcuffed
10    and detained; right?
11    A.  Yes.
12    Q.  All right.  Without having to watch all that.  And then
13    your involvement again, then you searched the car; right?
14    A.  Correct.
15    Q.  All right.  I'm just going to show you -- I can't --
16    were you with -- is it Swoop --
17    A.  Swope, Swope, yes.
18    Q.  Swope.  Were you with him that day?
19    A.  I was, yeah.
20    Q.  Okay.  So you're in a -- were you and him sharing a
21    patrol vehicle together?
22    A.  We were, yes.
23    Q.  Okay.
24    (Video played)
25    BY MR. OLSON:
```

1   Q.  Now, can you tell from what I just showed you of the

2   body cam clip, that's Swope's body cam, isn't it?

3   A.  It appears to be, yes.

4   Q.  Appears to be.  I didn't have it exactly identified.

5   But let me just see if this -- as we play this --

6   (Video played)

7   BY MR. OLSON:

8   Q.  Now, do you recognize that voice that just talked as

9   Swope?

10  A.  It sounds like Swope, yes.

11  Q.  Okay.  And on the right-hand corner of the screen, you

12  can see an elbow.  And that's where you are located over --

13  you went over to the passenger side and then were angled in

14  looking at this?

15  A.  Correct.

16  Q.  And providing cover over there; right?

17  A.  Yes.

18  Q.  And then your partner Swope appears to have gone to the

19  left and back of Jimenez; right?

20  A.  Correct.

21  Q.  That's -- we'll just do...

22  (Video played)

23  BY MR. OLSON:

24  Q.  All right.  And then so we just saw the sequence where

25  Mr. Childers is cuffed and then handed over to another

1    officer; right?

2    A.  Correct.

3    Q.  And that was he was handed off to Officer Porras; right?

4    A.  I didn't see who he was handed off to, but I'm assuming

5    so, yes.

6    Q.  And then -- this is just your partner's body cam, and it

7    continues, and then the same thing happened to the other two

8    occupants; right?

9    A.  Yes.

10   Q.  And then you searched the car; right?

11   A.  Yes.

12          MR. OLSON:  I have nothing further, Your Honor.

13          THE COURT:  Thank you, Mr. Olson.

14          Is there any redirect?

15          MS. SHNIDER:  No.  Thank you, Your Honor.

16          THE COURT:  Okay.  Thank you.  And, Officer Berg,

17   you may step down.

18          THE WITNESS:  Thank you.

19   (Balance of proceedings omitted from transcript)

20

21                    *     *     *

22

23

24

25

1

2          I, Erin D. Drost, certify that the foregoing is a

3    correct transcript from the record of proceedings in the

4    above-entitled matter to the best of my ability.

5

6                    Certified by:   *s/ Erin D. Drost*

7                                    Erin D. Drost, RMR-CRR

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25