# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

UNITED STATES OF AMERICA,                       Criminal No. 20-211 PAM/ECW

          Plaintiff,

    v.                                          **REPORT AND RECOMMENDATION**

VICTOR LEE CHILDERS,

          Defendant.

On September 29, 2020, Defendant Victor Lee Childers ("Childers" or "Defendant") was indicted on one count of Felon in Possession of Firearm. (Dkt. 4.) This matter is before the Court on Defendant's Motion to Suppress Evidence Obtained as a Result of Search and Seizure (Dkt. 22); and Defendant's Motion to Suppress Statements, Admissions, and Answers (Dkt. 23). This case has been referred to the undersigned United States Magistrate Judge for a report and recommendation pursuant to 28 U.S.C. § 636 and Local Rule 72.1.

The Court held a motion hearing on June 10, 2021. (Dkt. 32.) Ruth Shnider, Assistant U.S. Attorney, appeared on behalf of the United States of America. Douglas Olson, Office of the Federal Defender, appeared on behalf of Childers, who was present at the hearing on the instant motion. The briefing in this matter concluded on August 27, 2021. (Dkt. 47.) For the reasons stated below, the Court recommends that Defendant's Motion to Suppress Evidence Obtained as a Result of Search and Seizure (Dkt. 22) be

denied and that Defendant's Motion to Suppress Statements, Admissions, and Answers (Dkt. 23) be granted in part and denied in part.

## I.    FACTUAL BACKGROUND

At the June 10, 2021 hearing, Burnsville Police Officer Erica Huston testified about her encounter with Childers on the morning of July 25, 2020, which led to Childers' arrest.

Officer Huston testified that she responded to a "shots fired call" on July 25, 2020 before 8:00 a.m.  (Dkt. 38 (Transcript) at 5.)  The initial information received by police was that there were three males firing rounds into the water at the Riverfront Park area of Burnsville on Black Dog Road.  (*Id.* at 6.)  Officer Huston received the information through dispatch via the computer in her vehicle.  (*Id.* at 6.)  According to Officer Huston, a civilian had called 911 to report this information.  (*Id.* at 6.)  The initial dispatch communicated that there was a white male, 26 to 28 years of age, wearing a black t-shirt, on the shore shooting a 9-millimeter into the water, or possibly a .45 caliber weapon, but that the reporting party did not see the gun.  (*Id.* at 7, 21; Gov't Ex. 1.)

Officer Huston testified that the situation evolved as the dispatcher was getting more information.  (Dkt. 38 at 8.)  The reporting civilian informed dispatch that there were three males, two black males and one lighter-skinned male.  (Dkt. 38 at 7-9; Gov't Ex. 1.)  No witnesses identified any vehicle associated with the suspects at any point prior to the stop.  (Dkt. 38 at 24-25.)  Officer Huston was in route when the description about the suspects came from dispatch.  (*Id.* at 22.)  The reporting party also provided

information that the first suspect was near where the water drops off and where the barges are location.  (Dkt. 38 at 8-9; Gov't Ex. 1.)

Officer Huston testified that based on this information, she believed that several offenses were in progress, including a violation of a city ordinance against having a firearm in a park and felony reckless discharge of a firearm.  (Dkt. 38 at 10.)  Officer Huston also had a concern for public safety, as members of public were at the park where the report of shots originated.  (*Id.* at 10.)

Officer Huston arrived at the scene toward the riverfront park area, and eventually met up with her partner, Officer Jimenez.  (*Id.* at 11, 22.)  She initially approached one individual getting out of a vehicle on the side of the road to see if this was the suspect she was looking for.  (*Id.* at 27.)  Officer Huston noted that three to four other officers were with Officer Jimenez.  (*Id.* at 23.)  At that point, Officer Huston looked to her left and saw three people exit a wooded area and go into the parking lot.  (*Id.* at 11.)  She testified that the suspects were approximately 50-75 yards away from her at the time, although she further testified that they could have been at a distance similar to the length of the courtroom, and noted that she was bad with distances.  (*Id.* at 28.)  Officer Huston testified that she instructed Officer Jimenez and the other officers with him to stop the individuals because they matched the description of the individuals provided by dispatch. (*Id.* at 11, 24, 28.)  Officer Huston also testified that she believed that the individuals were the three suspects mentioned by dispatch because they were the only people she saw, there were no other individuals moving around, and the individuals coming out of the woods matched the description from dispatch—a light-skinned white male wearing a

black t-shirt and two black males.  (*Id.* at 12-13.)  Officer Huston testified that she believed at that time that the three individuals could be armed and dangerous.  (*Id.* at 13.) Officer Huston testified that this was a high risk stop because it dealt with a possible felony involving a firearm.  (*Id.* at 14.)  According to Officer Huston, felony stop procedures include officers drawing their guns and securing the occupants in a vehicle due to concerns relating to weapons.  (*Id.* at 14.)  According to Officer Huston, the vehicle at issue was parked and never moved.  (*Id.* at 26.)  Officer Huston agreed that Officer Jimenez conducted a felony stop of the vehicle with the three suspects and wrote the same in her report.  (*Id.* at 25-26.)

According to Officer Huston, by the time she arrived to the suspects' location, they had been ordered out of the vehicle, handcuffed, and secured as part of a high-risk felony stop.  (*Id.* at 14-15, 31.)  Burnsville Police Officer William Berg, who also responded to the dispatch call, testified that when he arrived, the stop was occurring, and it was his understanding that officers were stopping individuals who they believed to be involved in the reported shooting incident.  (*Id.* at 58.)  The driver was identified as Vic Childers and the two other African American occupants were juveniles.  (*Id.* at 14-15.)

Burnsville Police Officer Rick Porras testified that he also responded to a report of shots fired at Minnesota Riverfront Park off Black Dog Road and 35W.  (*Id.* at 36.)  By the time he arrived, he observed that his partners were already in the midst of conducting a high-risk felony stop of individuals they believed were likely to be involved with a shooting.  (*Id.* at 36, 46.)  Officers had their guns drawn.  (*Id.* at 47, 65.)  Officer Porras noted that as part of a felony stop, it is important to handcuff a suspect to keep the

individual from being able to use a firearm, especially in this case where there had been reports of shots fired. (*Id.* at 37.) When he arrived, Officer Porras noticed that Childers was being placed into handcuffs by Officer Tim Swope. (*Id.* at 36-37.) Officer Porras told Officer Swope that he would take control of Childers. (*Id.* at 37, 48.) The juveniles were also ordered out of the vehicle and handcuffed.[1] (*Id.* at 66.)

Officer Porras testified that Childers asked him why the officers had stopped him and were messing with him, and he explained what the call was about and that the officers were attempting to figure out what was going on and that Childers would be released if he had nothing to do with the shots fired. (*Id.* at 38-40; Gov't Ex. 2 at 8:08:29-36.) Officer Porras conducted a pat-down search of Childers for officer safety, especially in light of the fact that this matter involved a "shots fired" call. (*Id.* at 38.) Officer Porras testified that since the officers were responding to a shots fired call, he was looking for anything that might hurt himself or his partners, such as hard objects, and in this case, he was looking for guns, gun parts, or ammunition since it was a shots fired call. (*Id.* at 38.) Childers was still handcuffed at this time, and while some officers had their guns drawn, Officer Porras and Childers were away from those officers and no officers had their guns drawn on Childers during his pat-down and questioning. (*Id.* at

---

[1]     The video of the stop shows that an officer ordered Childers to place his hands up as he was sitting in the driver's side of a silver sedan. (Gov't Ex. 3 at 8:05.) The officer explained to Childers that there had been reports of shots fired and they were going to pull the occupants out one at a time; ordered the other occupants to keep their hands on the ceiling of the vehicle; ordered Childers to walk towards police standing up, and at one point ordered Childers to lift his shirt and spin, continue walking toward the officers, get on his knees, and then handcuffed him. (Gov't Ex. 3 at 8:06:00-8:07:02.) This process was repeated with the other occupants.

49.)  Officer Porras testified that at no point during this questioning had he read Childers his *Miranda* rights.  (*Id.* at 50.)

When Officer Porras told Childers he was going to pat him down, Childers responded that Officer Porras was going to do a *Terry* search and pat him down for weapons, to which Officer Porras responded "hell yes" and that he was going to conduct a "great" search.  (Gov't Ex. 2 at 8:08:48-54.)  They proceeded to argue about the scope of pat-down search.  (Dkt. 38 at 50.; Gov't Ex. 2 at 8:08:50-8:09:06.)

As he felt Childers' right pocket as part of the pat-down search, Officer Porras could tell based on his experience that Childers had ammunition in his pocket and proceeded to remove the ammunition.  (Dkt. 38 at 38-39, 55.)  Officer Porras testified that first he pulled out a cell phone, during which he also felt the bullets, and then went into the same pocket and pulled out a handkerchief (also referred to as a bandana).  (Dkt. 38 at 51-52; Gov't Ex. 2 at 8:09:06-24.)  Officer Porras asked Childers if there was anything illegal in the handkerchief, and Childers confirmed that there were bullets inside.  (Dkt. 38 at 51, 53; Gov't Ex. 2 at 8:09:27-34.)  Officer Porras announced to the other officers that he found ammunition on Childers.  (Dkt. 38 at 41, 51-52; Gov't Ex. 08:09:27-35-36.)  He also discovered a round of ammunition that may have fallen from a handkerchief that was retrieved from Childers.  (Dkt. 38 at 42.)  According to Officer Porras, Childers told him that they had found the bullets on the ground.  (*Id.* at 53; *see also* Gov't Ex. 2 at 8:09:27-34.)  Office Porras also asked him if he had a gun and Childers told him he did not have a gun and that there was no gun in the vehicle.  (Dkt. 38 at 53.)  When Officer Porras asked Childers if he knew why he was asking him these

6

questions, Childers responded that it was because of the report, but did not understand why the officers had the right to search them, to which Officer Porras responded that "now you have bullets, so that means there is a gun somewhere." (Gov't Ex. 2 at 8:10:32- 39.) Childers responded that "we found them" while smoking weed and that they had put the bullets in his pocket. (*Id.* at 8:10:39- 49.) Officer Porras then proceeded to ask Childers if he was a convicted felon, and Childers responded "yeah." (*Id.* at 8:10:49- 51.) Officer Porras told Childers that he could not even have ammunition, and Childers claimed he did not know. (*Id.* at 8:10:51-8:11:06.) Officer Porras also testified that it is standard practice to look at an individual's criminal history to determine if they are prohibited from having a firearm when one is found. (Dkt. 38 at 45.)

As part of the pat-down, Officer Porras also testified that he discovered a bubble pipe on Childers that was clean with no residue and a marijuana pipe. (Dkt. 38 at 42, 54.) Officer Porras stated that he did not care about these items as he was looking for a gun. (*See* Gov't Ex. 2 at 8:10:00-01 and 8:11:40-56.) The pat-down search of Childers' person lasted for approximately a little over three minutes. (*See* generally, Gov't Ex. 2 at 8:09:06-8:12:25.)

After the pat-down search, Childers was placed into a police vehicle. (Gov't Ex. 2 at 8:12:41.) After being placed in the vehicle, Childers told Officer Porras that he was very hot and Officer Porras asked Childers if he had ingested the methamphetamine, which Childers confirmed, stating that he had ingested the methamphetamine three to four minutes earlier. (Dkt. 38 at 43; Gov't Ex. 2 at 8:13:13-47 to 8:14:14.) This resulted in a medical situation, as Officer Porras did not want to have an overdose in police

custody. (Dkt. 38 at 43.) At that point, Officer Porras had his partner call for medics. (*Id.* at 43.) Childers was eventually placed into an ambulance for transport. (Gov't Ex. 2 at 8:23.)

Around this time, one of the officers announced that a firearm had been discovered under the driver's seat of the suspect vehicle. (Dkt. 38 at 43.) Officer Berg testified that he had heard the reports of the shooting and that bullets had been discovered in one of the suspect's pocket, so he proceeded to conduct a protective sweep of the vehicle. (*Id.* at 59.) Officer Berg also claimed that the situation at that time was fluid and was not clear if the occupants of the vehicle were going to be arrested, but believed at the time that they could be armed either on their person or in their vehicle. (*Id.* at 59-60.) The officers decided to search the vehicle for the guns first in "common gun places" as opposed to a plain view search, and Officer Berg ultimately found a handgun underneath the driver's seat, which he announced to his fellow officers. (*Id.* at 62; Gov't Ex. 3 at 8:10:53-8:12:44; Def. Ex. 2.) A second handgun was also found under the driver's seat. (Dkt. 38 at 62; Def. Ex. 2 at 8:16:50-8:30.) At some point, the officers conducted a more thorough search and the vehicle was ultimately towed. (Dkt. 38 at 63.)

## II.     <u>DISCUSSION</u>

Childers argues that during and after the purported *Terry* stop of his person, the police officers exceeded the bounds of constitutional reasonableness and hence violated the Fourth Amendment by: (1) exceeding the scope and intensity of a constitutionally permissible *Terry* stop, thereby converting the encounter into a de facto arrest which was not supported by probable cause; (2) exceeding the scope and intensity of a

constitutionally permissible *Terry* search of Childers' person; (3) eliciting statements from Childers by means of custodial interrogation, without having first provided the requisite *Miranda* warning; and (4) searching the vehicle absent a reasonable belief of danger and/or that the suspect may gain immediate control of a weapon. The Court proceeds with its analysis on these issues.

## A.    Motion to Suppress Evidence

### 1.    The Initial Stop and Detention of Childers

Childers argues that he was subjected to an illegal "de facto arrest" without probable cause that occurred "from the moment Mr. Childers was forcibly extracted from the vehicle, forced to the pavement, and handcuffed behind his back." (Dkt. 43 at 16.) The Government counters that the officers had reasonable suspicion to stop and investigate Childers and his companions and that the lawful bounds of that stop were not exceeded under the facts in this case. (Dkt. 44 at 10.)

The Fourth Amendment guarantees "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV. "The Fourth Amendment prohibits 'unreasonable searches and seizures' by the Government, and its protections extend to brief investigatory stops of persons . . . that fall short of traditional arrest." *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (citation omitted) (citing *Terry v. Ohio*, 392 U.S. 1, 9, (1968)), *overruled in part on other grounds by Davis v. Washington*, 547 U.S. 813 (2006). "[A]n officer may, consistent with the Fourth Amendment, conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal

activity is afoot." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000) (citation omitted); *see also United States v. Dortch*, 868 F.3d 674, 678 (8th Cir. 2017) (finding that an officer may conduct an investigative stop and brief detention when he "observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot") (marks and citations omitted). "[T]he police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry*, 392 U.S. at 21.

"While reasonable suspicion must be more than an inchoate hunch, the Fourth Amendment only requires that police articulate some minimal, objective justification for an investigatory stop." *United States v. Riley*, 684 F.3d 758, 763 (8th Cir. 2012) (internal quotation marks omitted). "Reasonable suspicion is considerably less than proof of wrongdoing by a preponderance of the evidence, and obviously less than is necessary for probable cause." *United States v. Mosley*, 878 F.3d 246, 251 (8th Cir. 2017) (marks and citation omitted). "Factors that may reasonably lead an experienced officer to investigate include time of day or night, location of the suspect parties, and the parties' behavior when they become aware of the officer's presence." *United States v. Dawdy*, 46 F.3d 1427, 1429 (8th Cir. 1995) (citation omitted). "In addition, a person's temporal and geographic proximity to a crime scene, combined with a matching description of the suspect, can support a finding of reasonable suspicion." *United States v. Quinn*, 812 F.3d 694, 698 (8th Cir. 2016) (citation omitted). In deciding whether the requisite degree of suspicion exists, a court views an officer's observations as a whole, rather than as discrete and disconnected occurrences. *See Waters v. Madson*, 921 F.3d 725, 736 (8th Cir. 2019)

(citation omitted).  "[O]fficers may draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person."  *United States v. Hurd*, 785 F.3d 311, 314 (8th Cir. 2015) (marks and citation omitted).  In addition, courts "must look at the 'totality of the circumstances' of each case to see whether the detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing."  *Arvizu*, 534 U.S. at 273 (quoting *United States v. Cortez*, 449 U.S. 411, 417-18 (1981)); *see also Hurd*, 785 F.3d at 314-15.

Here, the officers had sufficient reasonable suspicion to initially detain Childers for investigative purposes.  Officer Huston had information from a 911 call to police of shots being fired from possibly either a 9-millimeter or a .45 caliber weapon into the water at a public park involving one light skinned male wearing a black t-shirt with two dark skinned males, and shortly after she responded to the call and arrived on the scene, observed individuals matching that description in close vicinity to the reported shots fired.  The presence and subsequent corroboration of a tip can demonstrate "sufficient indicia of reliability to provide reasonable suspicion to make [an] investigatory stop." *Navarette v. California*, 572 U.S. 393, 397 (quoting *Alabama v. White*, 496 U.S. 325, 329 (1990)) (internal quotation marks omitted).  While Childers argues that information from an unverified tipster is insufficient to support a reasonable suspicion (Dkt. 47 at 3), in *Navarette*, the Supreme Court found that tips placed via 911 are especially reliable, because the "technological and regulatory developments" that allow 911 dispatchers to identify callers presumably discourage false reporting.  *See* 572 U.S. at 401.  Here, the

dispatcher had the identification of the reporting party, making it easy for law enforcement to hold him accountable for false reporting and making it reasonable for law enforcement to give weight and credibility to his information. *See United States v. LaGrange*, 981 F.3d 1119, 1122 (8th Cir. 2020) (finding that law enforcement are entitled to give a non-anonymous informant's tip greater weight because police can hold the informant accountable for any false information) (citing *United States v. Kent*, 531 F.3d 642, 648 (8th Cir. 2008)).

Moreover, as set forth above, Officer Huston was also able to corroborate the information provided by the caller. *See Alabama v. White*, 496 U.S. 325 (1990) (concluding that law enforcement's independent corroboration of an anonymous tip furnished reasonable suspicion of criminal activity). Based on the Incident Detail Report, a period of less than ten minutes had passed from when dispatch received the shots fired call and the officers ran the license plate of the car occupied by Childers. (Gov't Ex. 1; *see also* Dkt. 38 at 23.) This means that Officer Huston would have seen the individuals in proximity to the area in question and matching the description provided by the reporting party contemporaneously with the shots fired call. The tip, as timely corroborated by law enforcement, furnished reasonable, articulable suspicion that criminal activity had been, or was, afoot, including the felony crime of recklessly discharging a firearm, *see* Minn. Stat. § 609.66, subd. 1a(a)(3), or violating a city ordinance that prohibited firearms in parks (Dkt. 38 at 10). *See United States v. Juvenile TK*, 134 F.3d 899, 903 (8th Cir. 1998) (finding reasonable suspicion for stop by

"focus[ing] our analysis on the temporal and geographic proximity of the car to the scene of the crime, the matching description of the vehicle, and the time of the stop.").

Childers emphasizes that the 911 caller only heard the shots fired (Dkt 43 at 2), going so far as to speculate that the caller may have heard fireworks (Dkt. 47 at 1). But, although the caller said he could not see the gun, he was certain enough that one was being fired that he described it as either a .45 caliber or a 9-millimeter, giving the officers sufficient indicia of reliability that a firearm was being used in the park. Moreover, Childers claims that the stop was based only on a match of a general description. (Dkt. 47 at 1.) However, the stop was based on the match of three males, two black and one white, the match as to the black t-shirt worn by the white male, the fact that the individuals had emerged from the area at issue (that did not include many people) contemporaneous with the 911 call. These facts provided the officers with sufficient reasonable suspicion to justify the stop. *See United States v. Slater*, 979 F.3d 626, 630-31 (8th Cir. 2020) (finding that the suspects "matched the generic description of the assailants, they were in close temporal and geographical proximity to the crime, their clothing partly matched the assailants' clothing, and they were walking away from the crime scene" and "[t]his combination of factors supports a finding of reasonable suspicion justifying the stop").

In sum, the totality of the circumstances supports the conclusion that the officers had reasonable suspicion to stop Childers based on a felony firearm crime.[2]

---

[2]    The Court rejects the Government's assertion that the officers had probable cause to arrest Childers at this point. (Dkt. 44 at 18.) "An officer has probable cause to make a

## 2.      Scope of the Terry Stop

Childers also argues that the police officers exceeded the scope of a constitutionally permissible *Terry* stop, thereby converting the encounter into a de facto arrest, which was not supported by probable cause.  (Dkt. 9.)  No bright line separates a *Terry* stop from an unlawful arrest.  *See United States v. Sharpe*, 470 U.S. 675, 685 (1985) ("Much as a 'bright line' rule would be desirable . . . common sense and ordinary human experience must govern over rigid criteria."); *see also United States v. Fisher*, 364 F.3d 970, 973 (8th Cir. 2004) ("There is no 'litmus-paper test' or 'sentence or paragraph' rule to determine when, given the 'endless variations in facts and circumstances,' police-citizen encounters exceed the bounds of mere investigative stops.") (citations omitted). The investigation must be "reasonably related in scope to the circumstances which justified the interference in the first place." *Terry*, 392 U.S. at 20.  "[A]n investigative stop must cease once reasonable suspicion or probable cause dissipates." *United States v. Watts*, 7 F.3d 122, 126 (8th Cir. 1993) (citations omitted).

"An investigative detention may turn into an arrest if it lasts for an unreasonably long time or if officers use unreasonable force." *United States v. Maltais*, 403 F.3d 550, 556 (8th Cir. 2005) (marks and citations omitted).  In addition, the Eighth Circuit has

---

warrantless arrest when the facts and circumstances are sufficient to lead a reasonable person to believe that the defendant has committed or is committing an offense." *Royster v. Nichols*, 698 F.3d 681, 688 (8th Cir. 2012) (marks and citation omitted).  While there was reasonable suspicion based on the 911 tip and matching descriptions to investigate a possible crime, without the gun or the witness confirmation of the identification, the Court finds that a reasonable officer could not place Childers under arrest when they first came into contact with Childers.

identified several other factors for courts to consider in determining whether police have exceeded the permissible scope of a *Terry* stop, including:

> (1) the number of officers and police cars involved; (2) the nature of the crime and whether there is reason to believe the suspect might be armed; (3) the strength of the officers' articulable, objective suspicions; (4) the erratic behavior of or suspicious movements by the persons under observation; and (5) the need for immediate action by the officers and lack of opportunity for them to have made the stop in less threatening circumstances.

*United States v. Raino*, 980 F.2d 1148, 1149-50 (8th Cir. 1992) (citation omitted); *see also Peterson v. City of Plymouth*, 945 F.2d 1416, 1419-20 (8th Cir. 1991) (citation omitted).

Childers claims that the length of *Terry* stop here was undefined because the stop quickly evolved into an encounter tantamount to a formal arrest. (Dkt. 43 at 11.) As the Eighth Circuit has held, there is no specific length of detention that converts a *Terry* stop into a de facto arrest:

> "A detention may become a de facto arrest if it lasts for an unreasonably long time, but there is no rigid time limit on an investigatory detention." *United States v. Maltais*, 403 F.3d 550, 556 (8th Cir. 2005). In determining whether an investigatory detention is reasonable, we consider "the law enforcement purposes to be served by the stop as well as the time reasonably needed to effectuate those purposes." *United States v. Sharpe*, 470 U.S. 675, 685, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985). We also ask "whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly." *Id*. at 686, 105 S.Ct. 1568.

*Williams v. Decker*, 767 F.3d 734, 741 (8th Cir. 2014). The Eighth Circuit in *Williams* went on to find that "[t]aking roughly thirty minutes to accomplish this investigation did not run afoul of the Fourth Amendment." *Id.* at 742 (collecting cases).

As best as this Court can tell based on the video evidence, the bullets in his pocket and first firearm were discovered less than 10 minutes after Childers was removed from the car. (Gov't Exs. 2 and 3; Def.'s Ex. 2.) Given the danger posed to law enforcement and the public due to the connection between the occupants of the vehicle and the possible illegal discharge of a firearm, the approximately ten minutes that elapsed as needed to secure Childers and the other occupants from the vehicle and perform a protective sweep of the vehicle was not unreasonable.[3]

With respect to the number of officers involved with his stop, Childers concedes that it is difficult to determine the total number of officers, but estimates that upwards to a dozen officers were involved (perhaps more) and that six to eight squad cars were at some point involved with the stop, which supports his position that his detention was indicative of an arrest as opposed to a mere *Terry* stop. (Dkt. 43 at 13.) The Government counters that when Childers was initially confronted there were about three officers involved, with about four more officers eventually joining; and that in any event, the number of officers involved was not unreasonable based on the safety concerns present.

---

[3]    Childers cites to *Florida v. Royer,* 460 U.S. 491, 500 (1983) for the proposition that his detention, including its temporal scope, violated the Fourth Amendment. (Dkt. 43 at 11.) *Royer* involved an airport traveler suspected of transporting narcotics in his suitcase. 460 U.S. at 493-94. After approaching the traveler and questioning him, undercover officers took him into a large closet with a desk and two chairs, where the Court found he was in essence under arrest. *Id.* at 494-97. The Supreme Court found that "an investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop. Similarly, the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time." *Id.* at 500. The facts in *Royer* are inapposite to those here, given there was no mention of any use of firearms or other weapons in *Royer*, and therefore no apparent concern about the safety of officers and the public.

(Dkt. 44 at 17 n.7.)  While it is unclear, approximately five officers appear to have been in close proximity to Childers when he was handcuffed, and there were at least two additional officers in the distance.  However, given that there were three occupants in the suspect vehicle who were potentially involved with a firearms discharge in a city park, and that it was hard to see what they were doing in that vehicle, coupled with the fact that the vehicle was parked next to other vehicles in the parking lot while the public was coming and going (*see* Def. Ex. 1), this Court finds that the number of officers utilized was reasonably necessary to "maintain status quo during that stop" as well as to protect their safety and the safety of the public.  *United States v. Navarrete-Barron*, 192 F.3d 786, 790 (8th Cir. 1999) (citing *United States v. Hensley*, 469 U.S. 221, 235 (1985)) (finding that during a *Terry* stop, officers may take steps that are "reasonably necessary to protect their personal safety and to maintain the status quo during the course of the stop").

Childers also asserts that his detention exceeded the scope of a proper *Terry* stop because there was a low risk of danger, as shooting a gun in a river was merely risky behavior, as opposed to intentional violence against another, and because the officers did not observe any firearms on the persons when they were seen exiting the woods.  This Court disagrees.  (Dkt. 43 at 14.)  The officers had received information of an active shooter in a public city park and had corroborated this information based on the description of the individuals involved and their location contemporaneous with the report.  The mere fact that the individuals were not shooting directly at a person in a park did not mean that they did not pose a threat to the public, particularly given their alleged

reckless discharge of a firearm and because the officers did not know how they would react to the stop. As set forth above (*see supra*, Section II.A.1), the officers had sufficient information that the individual might be armed, and the individual had been discharging the handgun in a public park. Further, the fact that the officers did not observe the handgun does not dispel the danger given that handguns may be concealed on one's person.

While Childers concedes that the police officers' use of force, commands, and restraints does not automatically convert a *Terry* stop into a de facto arrest, he argues that the risk of danger in this case was low and could have been addressed by less intrusive methods and that the intrusive means used together are indicative of an arrest. (Dkt. 43 at 15; Dkt. 47 at 6-8.) The Government counters that Eighth Circuit jurisprudence confirms that the officers' actions in this case, including drawing their weapons and handcuffing the suspects, were within the scope of a lawful *Terry* stop because the officers reasonably believed a firearm could be present. (Dkt. 44 at 15.) With respect to the effect of use of force in classifying a detention as a *Terry* stop or a de facto arrest, the Eighth Circuit has held as follows:

> When officers are presented with serious danger in the course of carrying out an investigative detention, they may brandish weapons or even constrain the suspect with handcuffs in order to control the scene and protect their safety. In discerning whether an officer's actions meet the Fourth Amendment's standard of reasonableness, the issue is whether the officer has an objectively reasonable concern for officer safety or suspicion of danger.

*United States v. Sanford*, 813 F.3d 708, 712-13 (8th Cir. 2016) *Sanford*, 813 F.3d at 713 (cleaned up); *see also United States v. Smith*, 645 F.3d 998, 1002 (8th Cir. 2011) (finding

that the Eighth Circuit has "repeatedly held that police officers may reasonably handcuff a suspect . . . during the course of a *Terry* stop in order to protect their safety and maintain the status quo."); *United States v. Martinez*, 462 F.3d 903, 907 (8th Cir. 2006) ("[T]he use of handcuffs did not convert this *Terry* stop into an arrest.") (collecting cases)); *United States v. Fisher*, 364 F.3d 970, 973 (8th Cir. 2004) ("It is well established, however, that when officers are presented with serious danger in the course of carrying out an investigative detention, they may brandish weapons or even constrain the suspect with handcuffs in order to control the scene and protect their safety."). Here, the officers were confronted with a call related to shots fired in a public park, and that call was corroborated by the match between the three individuals in the suspect vehicle and the reported description of the suspects. In light of the fact that the persons were likely armed, coupled with the fact that they were inside a vehicle where it is inherently more difficult to see the occupants' hands, the officers had an objectively reasonable concern not only for their safety, but the safety of other members of the public who were in the vicinity of the parking lot at the park. As such, the officers' actions of drawing their weapons, ordering out the individuals, and handcuffing them was objectively reasonably necessary to maintain the status quo. To assert that there were less intrusive methods in this situation because there was no assertion that the suspects were firing at anyone and based on the number of responding officers assumes the officers could predict how the suspects would react when confronted by the police and their state of mind.[4] The law

---

[4]    Indeed, while the officers did not immediately know this fact when they initially encountered the occupants of the vehicle, Childers had ingested enough

counsels against such after-the-fact second-guessing; all that is required is that the officers acted in an objectively reasonable manner to ensure their safety and that of the public based on the facts that they possessed. *See Slater*, 979 F.3d at 629 (quoting *United States v. Hollins*, 685 F.3d 703, 706 (8th Cir. 2012)). ("We consider 'what the officer reasonably knew at the time" rather than assessing the existence of reasonable suspicion "with the vision of hindsight.'").[5]

It is also important to emphasize that Childers was handcuffed no longer than necessary prior to his arrest because, for the reasons stated below, probable cause for his arrest was established quickly once the firearm was discovered. *See Navarrete-Barron*, 192 F.3d at 791 (holding that detention did not last for an unreasonably long time because probable cause to arrest defendant was established shortly after he was detained).

### 3.    Search of Childers' Person

Childers asserts that the search of his person in this case exceeded the scope of a constitutionally permissible *Terry* search, such that any direct or derivative fruits of the search must be suppressed, because the search was a search for evidence as opposed to protecting against danger, especially since the bullets found did not pose a danger to the officers.  (Dkt. 43 at 18-20.)  The Government claims that Childers' argument ignores the

---

methamphetamine that they decided to send him to the hospital for medical attention once they learned of his condition.

[5]    Given that the Court finds that Childers was not under arrest when initially detained and handcuffed by police for safety purposes, it does not need to address whether the evidence found during the search is a derivative fruit of an initial illegal arrest, as raised in Childers' reply.  (Dkt. 47 at 4-6.)

fact that Officer Porras' search was the result of his reasonable belief that Childers could be armed and dangerous, that bullets are the type of contraband the officers would want to secure in order to ensure their safety, and that, regardless, officers may seize items that are apparently incriminating evidence as part of a lawful *Terry* pat down search.  (Dkt. 44 at 19-23.)

"Under *Terry*, a law enforcement officer may conduct a warrantless pat-down search for the protection of himself or others nearby in order to discover weapons if he has a reasonable, articulable suspicion that the person may be armed and presently dangerous."  *United States v. Muhammad*, 604 F.3d 1022, 1027 (8th Cir. 2010).  Courts apply "an objective test when determining whether the police officer had reasonable, articulable suspicion for the pat-down.  To pass this test, the officer does not need to be certain that the suspect was armed.  Rather, a pat-down is permissible if a 'reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger.'"  *United States v. Horton*, 611 F.3d 936, 941 (8th Cir. 2010) (quoting *Terry*, 392 U.S. at 27).  As stated previously, given that call to the police reported the use of a firearm and that Childers matched the description of one of the persons involved in the firing of a handgun, Office Porras had an objectively reasonable basis to conduct a pat-down search for concealed weapons in order to ensure his safety and the safety of others.  *See United States v. Hawkins*, 830 F.3d 742, 745 (8th Cir. 2016) (marks and citations omitted) ("A *Terry* search must be reasonable under the circumstances, officers may take any measure that are reasonably necessary to protect their personal safety and to maintain the status quo during the course of the stop.

**Though a pat-down is often the least intrusive way to search for a hidden firearm, concern for officer safety may justify lifting clothing or even reaching directly for a weapon in a waistband**.") (emphasis added).[6]

As to the scope of the search, the issue before the Court is two-fold: (1) whether bullets constituted a present danger to the officers and the public sufficient to fall under the scope for a search for weapons as part of a *Terry* frisk; and (2) whether the bullets were otherwise apparent as contraband during the pat-down search. With respect to the first issue, the Court finds the Eleventh Circuit rationale concluding that ammunition falls within the proper scope of a *Terry* frisk to be persuasive:

> Johnson argues that, because the scope of a frisk is limited to a search for weapons and ammunition is not a weapon, Officer Williams was not entitled to remove the ammunition from his pocket. But Johnson reads *Terry* as if the central question it posed were whether a given object qualifies as a "weapon" in the abstract and not whether removing and securing the object is reasonably related to "the protection of the police officer and others nearby," 392 U.S. at 29, 88 S. Ct. 1868. In *Terry*, the Supreme Court contemplated that an officer could, of course, remove "guns, knives, [and] clubs," but it never limited a frisk to those specified weapons. *Id.* Instead of creating a laundry list of particular objects that an officer may remove during a frisk, the Supreme Court explained that "[t]hese limitations will have to be developed in the concrete factual circumstances of individual cases." *Id.* And when applying *Terry* in individual cases, we have ruled that officers are entitled to seize a variety of items that are not traditional weapons. *See, e.g.*, *Clay*, 483 F.3d at 743 (holding that an officer lawfully seized a "long, thin object," which turned out to be the empty barrel of a ballpoint pen, because

---

[6]    The Court notes that Officer Porras clarified on redirect that he felt the bullets during his pat-down, from the outside, and before reaching into Childers' pocket for the first time. (Dkt. 37 at 55.) As such, Officer Porras' removal of a cell phone from Childers' pocket before the bullets is distinguishable from *United States v. Johnston*, where the officer testified that when he reached into the suspect's pocket and removed cell phones, resulting in the discovery of narcotics, he knew the cellphones were not guns or any other type of weapons. No. CR. 14-50028-JLV, 2014 WL 3573406, at *13 (D.S.D. July 21, 2014).

he thought it "might be a screwdriver or something similar that could be used as a weapon"). After all, *Terry* explained that an officer can also remove "other hidden instruments for the assault of the police officer." 392 U.S. at 29, 88 S.Ct. 1868; *see also Sibron v. New York*, 392 U.S. 40, 65, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968) (*Terry*'s companion case also ruling that an officer may remove "concealed objects which might be used as instruments of assault").

In considering a frisk's proper scope, we cannot isolate *Terry*'s references to "weapons" from the "sole justification" for the frisk: "the protection of the police officer and others nearby." 392 U.S. at 29, 88 S.Ct. 1868. To be sure, the scope of a frisk must be "carefully limited" to serve that justification, *id.* at 30, 88 S.Ct. 1868, but it must not be so limited that officers cannot take reasonable actions in furtherance of their own safety and that of others. As the *Terry* Court made clear, we cannot "deny the officer the power to take necessary measures ... to neutralize the threat of physical harm." *Id.* at 24, 88 S.Ct. 1868. In short, during a *Terry* frisk, an officer may remove ammunition from a suspect when the removal is reasonably related to the protection of the officers and others nearby. *See id.* at 19-20, 88 S.Ct. 1868.

Johnson argues that "the way to defuse the potential danger [posed by ammunition] is to locate and seize the firearm that might be present," but we cannot, with hindsight, dictate best practices for police officers. "A creative judge engaged in post hoc evaluation of police conduct can almost always imagine some alternative means by which the objectives of the police might have been accomplished." *United States v. Sharpe*, 470 U.S. 675, 686–87, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985). Instead of imagining other ways to defuse the danger posed by ammunition, we assess only whether an officer acted reasonably in his circumstance. *See id.*

Officer Williams acted reasonably when he seized the ammunition and holster in Johnson's pocket. He was entitled to "tak[e] steps to assure" himself that the ammunition in Johnson's pocket would not be loaded into "a weapon that could . . . fatally be used against [him]." *Maryland v. Buie*, 494 U.S. 325, 333, 110 S.Ct. 1093, 108 L.Ed.2d 276 (1990) (discussing the protection concerns that animate a *Terry* frisk). When Officer Williams seized the ammunition and empty holster, he had every reason to expect that a matching gun was nearby. Officer Williams even testified that the ammunition in Johnson's pocket "led [him] to believe that there [wa]s a weapon that [the] round goes to and something goes into that holster." And he explained that suspects "throw[ ]" away weapons "a lot in Opa-Locka" when they encounter the police. When Officer Williams found only a single

round of ammunition in Johnson's pocket, he was left to fear where other ammunition may be, especially a round already loaded into a gun's chamber.

That Johnson was handcuffed when he was frisked did not eliminate the danger posed by the ammunition. The Supreme Court has rejected as "mistaken" the argument that officers cannot reasonably fear for their safety when a suspect "was effectively under [the officers'] control during the investigative stop and could not get access to any weapons that might have been located [nearby]." *Michigan v. Long*, 463 U.S. 1032, 1051, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983). Handcuffs do not always work, and suspects have been known to reach for weapons even when handcuffed. *See United States v. Sanders*, 994 F.2d 200, 209-10 (5th Cir. 1993) (rejecting the argument "that, by handcuffing a suspect, the police instantly and completely eliminate all risks that the suspect will . . . do them harm").

When Johnson was stopped and frisked, the officers had not found a gun on the scene, did not know how many or what kind of guns might be on the scene, and did not know whether others, who were not handcuffed, participated in the burglary and were still lurking in the area. But the officers did know, based on their experience, that burglaries in Opa-Locka often involve guns and often involve more than one person. "In view of these facts, we cannot blind ourselves to the need for law enforcement officers to protect themselves. . . ." *Terry*, 392 U.S. at 24, 88 S.Ct. 1868.

*United States v. Johnson*, 921 F.3d 991, 1000-01 (11th Cir.), *cert. denied*, 140 S. Ct. 376

(2019); *see also United States v. Portillo-Saravia*, 379 F. Supp. 3d 600, 618 (S.D. Tex.

2019) (marks and citation omitted) ("After recognizing the Defendants possessed bullets,

the officers were entitled to seize the bullets for their protection. Bullets are an essential

part of a lethal weapon. The officers were entitled to take steps to assure themselves that

the ammunition in Defendants' pockets would not be loaded into a weapon that could

fatally be used against. Both Defendants were handcuffed, but that did not eliminate the

danger posed by the ammunition; handcuffs fail on occasion and suspects sometimes

reach for weapons even when handcuffed. Officer Saldana's seizure of the bullets served

a second protective purpose; removing them from Defendants' pockets for inspection

could inform the officers of what caliber or type of gun might be nearby, facilitating the gun's recovery.") (cleaned up).

Here, Officer Porras testified that as he felt Childers' right pocket as part of the pat-down search, he could tell based on his experience that Childers had ammunition in his pocket and proceeded to remove the ammunition. (Dkt. 38 at 38-39, 55.) The video of the search shows the bullets were discovered at the beginning of the pat-down search. This fact is important. The purpose of the search was the protection of officers and the public due to a reasonable likelihood that a firearm was present in the vicinity, and the bullets were seized prior to the completion of the pat-search for such weapons. Under these facts, the recovery of the bullets is within the scope of a *Terry* search because the officers were unsure of the location of the firearm or firearms and the seizure was effected to protect the officers from the possibility that the defendants possessed or otherwise had access to firearms, into which the bullets could then be inserted and then possibly fired at them. *See United States v. Gardner*, No. CRIM. 12-217, 2013 WL 5918313, at *9 (W.D. Pa. Nov. 1, 2013) (citations omitted). While Childers was handcuffed during the pat-down search, Officer Porras' seizure of the bullets was reasonable because the location of the gun was unknown. *Terry* permits seizure of a firearm from a handcuffed person, and similarly, seizing bullets to prevent Childers or the other occupants of the vehicle from having access to them and potentially using them with the still unaccounted-for gun is also within the scope of a *Terry* frisk. The mere fact that Officer Porras announced the discovery of the bullets, as noted by Childers (Dkt. 43

at 19-20), does not negate the risk to the officers.  In fact, it serves the protection purpose of *Terry* by informing the officers of the probability of a firearm in the vicinity.

For all of the reasons stated above, the Court finds that seizing the bullets fell within the justification for the frisk under *Terry*: "the protection of the police officer and others nearby."  *See Terry*, 392 U.S. at 29.  As such, the motion to suppress related to the pat-down search should be denied.[7]

### 4.    Search of the Vehicle

Childers also challenges the warrantless search and seizure of the firearms from the vehicle.  (Dkt. 43 at 22.).  Childers argues that the search was improper under the Supreme Court's decision in *Michigan v. Long*, as there was no reasonable suspicion of danger and on the basis that Childers had already been placed under *de facto* arrest without probable cause, making the search a derivative fruit of the unlawful arrest.  (Dkt. 43 at 22; Dkt. 47 at 8-9.)  The Court rejects this argument for the same reasons that it found that the detention and the scope of the *Terry* stop were proper and did not amount to a de facto arrest.  (*See supra*, Section II.A.)

Childers also challenges the search on the basis that his "extraction, handcuffing, transport, and restraint" show "that there was no 'danger' that any suspect could 'gain immediate control of weapons.'"  (Dkt. 43 at 22-23.)  Searches of automobiles conducted without a warrant are per se unreasonable, subject to a few well-established exceptions.

---

[7]    Given that the Court has recommended denying the motion for falling within the scope of a *Terry* frisk, it does not reach whether the bullets were properly discovered under the plain-touch doctrine.

*United States v. Hill*, 386 F.3d 855, 858 (8th Cir. 2004) (citations omitted).  In *Michigan v. Long*, the Supreme Court laid out an exception to the warrant requirement, holding that "the search of the passenger compartment of an automobile, limited to those areas in which a weapon may be placed or hidden, is permissible if the police officer possesses a reasonable belief based on 'specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant' the officer in believing that the suspect is dangerous and the suspect may gain immediate control of weapons."  463 U.S. 1032, 1049 (1983) (quoting *Terry*, 392 U.S. at 21).  The Eighth Circuit, relying on *Long,* has also held that "when police officers have reasonable suspicion to conclude that the driver of a car is armed and dangerous, they are entitled to search not only the driver's person but also the driver's car for any weapons that might endanger the officers." *United States v. Scott*, 818 F.3d 424, 430 (8th Cir. 2016) (citing *Long*, 463 U.S. at 1045-52).  Moreover, once reasonable suspicion is established, a protective search of a vehicle is allowed even if the occupants have been removed from the vehicle and are handcuffed. *See United States v. Stewart*, 631 F.3d 453, 457 (8th Cir. 2011) ("Additionally, it is settled that once reasonable suspicion is established, a protective search of a vehicle's interior is permissible regardless of whether the occupants have been removed from the vehicle."); *United States v. Morgan*, 729 F.3d 1086, 1090-91 (8th Cir. 2013) ("[T]he limits of a *Terry* stop were not exceeded when Morgan was removed from the vehicle and handcuffed, and Normandin conducted a protective sweep of the vehicle."); *Navarrete-Barron*, 192 F.3d at 791 ("It is well established that once reasonable suspicion is established, a search of a vehicle's interior is permissible regardless of whether police

officers have removed the occupants of the vehicle.").  The rationale of this rule is the threat that a suspect in Childers' position (or one of the two other occupants of the vehicle), could break away from police control and retrieve a weapon from the automobile, or could retrieve the weapon from the vehicle if released.  *See Long*, 463 U.S. at 1051-52 ("[J]ust as a *Terry* suspect on the street may, despite being under the brief control of a police officer, reach into his clothing and retrieve a weapon, so might a *Terry* suspect in Long's position break away from police control and retrieve a weapon from his automobile.  Also, if the suspect is not placed under arrest, he will be permitted to reenter his automobile, and he will then have access to any weapons inside."); *United States v. Shranklen*, 315 F.3d 959, 962 (8th Cir. 2003) ("[A] search for weapons at an investigative stop can be reasonable, even where suspects lack immediate access to weapons.  Rather, it is enough that the suspects might be able to access the weapons stored in their vehicle."); *United States v. Peoples*, 925 F.2d 1082, 1087 (8th Cir. 1991) ("Absent an arrest, the suspects would have been free to reenter the van and pose a danger to the officers.") (citations omitted).

Here, Officer Berg testified that he had heard the reports of the shooting and that bullets had been discovered in one of the suspect's pockets, so he proceeded to conduct a protective sweep of the vehicle for weapons.  (Dkt. 38 at 59.)  Officer Berg also claimed that the situation at that time was fluid and was not clear if the occupants of the vehicle were going to be arrested but he believed at the time that they could be armed either on their person or in their vehicle.  (*Id.* at 59-60.)  Indeed, the officers decided to search the vehicle for the gun first in "common gun places," and Officer Berg found a handgun

underneath the driver's seat. (*Id.* at 62; Gov't Ex. 3 at 8:10:53-8:12:44; Def. Ex. 2.) A second handgun was also found under the driver's seat. (Dkt. 38 at 62; Def. Ex. 2 at 8:16:50-8:30.) The fact that the occupants had been detained did not negate the need for the protective sweep given the possibility that they could break away from police control and does not serve as a basis for suppression under the facts of this case. As such, the Court recommends denying the motion to suppress as to the firearms seized the suspect vehicle.

## B.    Motion to Suppress Statements

Childers seeks suppression of statements made by him in the course of his pat-down by Officer Porras and his post-custodial statement in September 2020. Pursuant to *Miranda v. Arizona*, an individual must be advised of his right to be free from compulsory self-incrimination and the right to the assistance of an attorney any time the individual is taken into custody for questioning. 384 U.S. 436, 444 (1966). Accordingly, the protections afforded by *Miranda* are triggered when an individual "'is both in custody **and** being interrogated.'" *United States v. Boyd*, 180 F.3d 967, 976 (8th Cir. 1999) (quoting *United States v. Hatten*, 68 F.3d 257, 261 (8th Cir. 1995)) (emphasis added); *see also Stansbury v. California*, 511 U.S. 318, 322 (1994). Moreover, once an individual is provided his *Miranda* rights, his statements may be used if he knowingly and voluntarily waives those rights. *See United States v. Bell*, 477 F.3d 607, 612 (8th Cir. 2007) (citations omitted).

Given this backdrop, the Court will proceed with analyzing the statements at issue.

1.      **Statements made During Childers' Initial Encounter with Police**

Childers argues that in the course of the encounter described above, Officer Porras "elicited statements from Mr. Childers which directly implicated the suspected offense, e.g., queries concerning contents of the bandana pulled from the pocket, whether he was a felon, the existence and location of firearms in his possession, and the like." (Dkt. 43 at 21.)  The Court will only address the specific queries identified by Childers.  As set forth above, as part of its analysis under *Miranda*, a Court must determine whether Childers was in custody for the purposes of *Miranda*; and (2) whether the responses from Childers was the result of an interrogation that was subject to no exceptions.

a.      **Custody**

For the purposes of *Miranda*, "the custody inquiry [ ] turns on whether, given the totality of the circumstances, a reasonable person would have felt at liberty . . .  to terminate the interrogation and cause the agent to leave."  *United States v. New*, 491 F.3d 369, 373 (8th Cir. 2007) (internal citation omitted).  "We do not ask how [the defendant] perceived the situation; . . . the point is how a reasonable person would have seen his options in the circumstances."  *United States v. Perrin*, 659 F.3d 718, 719 (8th Cir. 2011) (citation omitted); *see also United States v. Wolk*, 337 F.3d 997, 1006 (8th Cir. 2003) ("'[T]he initial determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned.'") (alteration in original) (quoting *Stansbury v. California*, 511 U.S. 318, 323 (1994)).  When ascertaining whether a suspect is in custody, courts in

many instances cite to and consider the following non-exhaustive six "indicia of custody" articulated in *Griffin*:

> (1) whether the suspect was informed at the time of questioning that the questioning was voluntary, that the suspect was free to leave or request the officers to do so, or that the suspect was not under arrest;
>
> (2) whether the suspect possessed unrestrained freedom of movement during the questioning;
>
> (3) whether the suspect initiated contact with authorities or voluntarily acquiesced to official requests to respond to questions;
>
> (4) whether strong arm tactics or deceptive stratagems were employed during questioning;
>
> (5) whether the atmosphere of the questioning was police dominated; and
>
> (6) whether the suspect was placed under arrest at the termination of the questioning.

*United States v. Thomas*, 664 F.3d 217, 222 (8th Cir. 2011) (citing *Griffin*, 922 F.2d at 1349); *see also United States v. Laurita*, 821 F.3d 1020, 1024 (8th Cir. 2016). However, "[i]t is not necessary to a finding of custody that all of the foregoing indicia be presented by the factual circumstances of a case. . . ." *Griffin*, 922 F.2d at 1349. "'[A] particularly strong showing with respect to one factor may compensate for a deficiency with respect to other factors.'" *Thomas*, 664 F.3d at 222 (citation omitted). The *Griffin* factors are not by any means exclusive, and custody cannot be resolved merely by counting up the number of factors on each side of the balance and rendering a decision accordingly. *See Perrin*, 659 F.3d at 720 (cautioning that the factors in *Griffin* are "simply a rubric for considering the ultimate issue, not a mandatory checklist").

Applying these principles to the present case, the Court finds under the totality of the circumstances that Childers was in custody for the purposes of *Miranda*. It is true that Officer Porras explained to Childers that the officers were attempting to figure out what was going on and Childers would be released if he had nothing to do with the call. (Dkt. 38 at 38-40; Gov't Ex. 2 at 8:08:29-36.) However, even this statement is qualified—Childers was only going to be released **if** he had nothing to do with the shooting. Moreover, Childers was never told that he was free to leave when the statements at issue were elicited or told at the time of questioning that the questioning was voluntary. Further, Childers was restricted to a degree that is often associated with a formal arrest given that he was handcuffed during this time. *See United States v. Martinez*, 462 F.3d 903, 909 (8th Cir. 2006). The Court is cognizant that while many *Terry* stops do not trigger the need for a *Miranda* warning, the fact that Childers was handcuffed at the time of his questioning weighs in favor of finding that he was in custody for the purposes of *Miranda*. *See Martinez*, 462 F.3d at 909-10 (citing *United States v. Pelayo-Ruelas*, 345 F.3d 589, 592 (8th Cir. 2003)) ("'[M]ost *Terry* stops do not trigger the detainee's *Miranda* rights.' In this case, as we have said, Martinez was, under the circumstances, subjected to restraint associated with formal arrest, and was interrogated during that custody. Therefore, we follow the Supreme Court's cue and find that he was entitled to *Miranda* warnings at the time he was handcuffed. Since *Miranda*

warnings were not given before Martinez gave conflicting accounts of how he got the wad of cash, those statements should have been suppressed.").[8]

### b.    Interrogation

The Supreme Court has defined "'interrogation' as 'any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response.'" *United States v. Tapia-Rodriguez*, 968 F.3d 891, 894 (8th Cir. 2020) (quoting *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980)). Here, Childers specifically challenges inquiries made related to the contents of the bandana taken from his pocket, whether he was a felon, and the existence and location of firearms in his possession. (Dkt. 43 at 21.)

The video evidence in this case shows Officer Porras asking Childers if anything in the handkerchief that had been taken out of his pocket was illegal and Childers responding that the handkerchief contained bullets and they just found them. (Gov't Ex. 2 at 08:09:27-34.) Officer Porras also asked Childers, "for the safety of my officers and the occupants of the vehicle, where is the gun at?" (Gov't Ex 2 at 08:10:10-15.) Childers

---

[8]    This Court notes that it is important to emphasize that the Eighth Circuit in *Martinez* distinguished between handcuffing for the purposes of *Terry* and *Miranda*, finding that that "[w]hether Martinez was 'in custody' for purposes of *Miranda* after being handcuffed during the *Terry* stop is a separate question from whether that handcuffing constituted an arrest for which probable cause was required" and concluding that "[p]lacing Martinez in handcuffs was a reasonable response to the situation in order to protect the officers' personal safety and to maintain the status quo. As such, the use of handcuffs did not convert this *Terry* stop into an arrest." *Martinez*, 462 F.3d at 907. In sum, the Court finds that the indicia of custody for the purposes of *Miranda* does not change this Court's conclusion that Childers' initial restraint was a permissible *Terry* stop that was justified by reasonable suspicion of a firearms offense.

responded, "I don't have a gun." (*Id.* at 08:10:15-16.) Officer Porras again asked "where is the gun at in the car?" (*Id.* at 08:10:16-17.) Childers responded, "I don't know, I do not have a gun." (*Id.* at 08:10:17-20.) Officer Porras further asked if Childers had seen a gun in the car, to which Childers responded, "No" and that he did not know anything about a gun in the car. (*Id.* at 08:10:20- 25.) When Officer Porras asked Childers if he knew why he was asking him these questions, Childers responded that it was because of the shots fired report, but he did not understand why the officers had the right to search them, to which Officer Porras responded that "now you have bullets, so that means there is a gun somewhere." (*Id.* at 8:10:32- 39.) In response to the statement, Childers stated "we found them" while smoking marijuana and that he had put them in his pocket. (*Id.* at 8:10:39- 49.) Officer Porras then proceeded to ask Childers if he was a convicted felon, and Childers responded "yeah." (*Id.* at 8:10:49- 51.) Officer Porras told Childers that he could not even have ammunition and Childers claimed he did not know. (*Id.* at 8:10:51-8:11:06.)

The Court first considers Officer Porras' questions and Childers' statements about the contents of the bandana and the whereabouts of the gun. Although the Court has concluded that Childers was in custody for the purposes of *Miranda* when these statements were elicited, the statements occurred when the officers reasonably suspected that Childers was involved with the discharge of a firearm in a public park and before they found any firearm. Thus, the "need for answers to questions in a situation posing a threat to the public safety outweigh[ed] the need for the prophylactic rule protecting the Fifth Amendment's privilege against self-incrimination." *See New York v. Quarles*, 467

U.S. 649, 657 (1984); *see also United States v. Thompson*, 976 F.3d 815, 824 (8th Cir. 2020) ("Second, we consider Thompson's responses to the questions, "Is there anything illegal in the car," "Is there a gun in the car," and "Where's the gun at?"  We agree with Thompson that he was in custody when he made these statements.  But the district court concluded that the statements were nevertheless admissible under the public-safety exception.  We agree, and Thompson offers no argument to the contrary.") (citation omitted); *United States v. Becerra*, 958 F.3d 725, 729-30 (8th Cir. 2020) ("The . . . officer then asked whether he 'had any weapons or anything illegal' on him, which prompted him to admit that 'he had bullets in his pocket.'").  As such, the motion to suppress statements in this regard is denied because the questions fall within the public safety exception.

As to the statements related to Childers' status as a felon in possession of firearms or bullets, the Government has represented that to the extent this Court finds Childers was in custody at that moment for purposes of *Miranda*, and because that question was asked after Officer Porras discovered the bullets, the Government has agreed it will not use Childers' statements about his felon status in its case-in-chief at trial.  (Dkt. 44 at 33-34.)  Indeed, a *Miranda* warning must precede questioning where the officer "should reasonably be aware that the information sought . . . is directly relevant to the substantive offense charged."  *United States v. Sanchez-Velasco*, 956 F.3d 576, 582 (8th Cir. 2020) (citations omitted).  Based on the record in this case, the Court finds that Officer Porras was attempting to obtain incriminating statements regarding Childers' status as a felon, as evidenced by his follow-up statements to Childers that it was even illegal for him to have

bullets in his possession as felon.  In light of the Court's ruling as to custody for the purposes of *Miranda* and the Government's representation, the Court grants the motion to suppress insofar as the Government will not be allowed to use any statements inquiring as to Childers' status as a felon and any statements elicited from Childers resulting from Officer Porras telling him that he could not even possess bullets.  *See United States v. Synkiew*, No. CRIM 09-382 JMR/AJB, 2010 WL 1286080, at *3 (D. Minn. Mar. 8, 2010), *R.&R. adopted by*, 2010 WL 1292492 (D. Minn. Mar. 29, 2010) ("Statements made by the defendant upon being asked, "are you a convicted felon" . . . , were made in response to questioning by officers, without the benefit of the *Miranda* warning, and the defendant's response, along with statements made thereafter to arresting officers, should be suppressed.").

### 2.    Voluntariness of his September 2020 Statement

Childers argues that his September 2020 custodial interview "should be suppressed as it was involuntary, and was not preceded by a knowing and intelligent waiver of his *Miranda* rights."  (Dkt. 43 at 23.)  Once an individual is provided his *Miranda* rights, his statements may be used if he knowingly and voluntarily waives those rights.  *See Bell*, 477 F.3d at 612.  The Eighth Circuit has found that:

> There are "two distinct dimensions" to whether a suspect's waiver of his Miranda rights was voluntary, knowing, and intelligent.  *Moran v. Burbine*, 475 U.S. 412, 421, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986).  First, the waiver "must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception."  *Id.* Second, the suspect must have waived his rights "with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it."  *Id.*  The government bears the burden of proving, by a preponderance of the evidence, the validity of a *Miranda* waiver.

*Colorado v. Connelly*, 479 U.S. 157, 169, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986).

*United States v. Figueroa-Serrano*, 971 F.3d 806, 814 (8th Cir. 2020), *cert. denied*, No. 20-7528, 2021 WL 2637914 (U.S. June 28, 2021). The Court must examine the totality of the circumstances in determining whether a waiver of *Marinda* rights is valid. *Id.*

"In considering whether a [statement] was voluntary, the determinative question is whether the [statement] was extracted by threats, violence, or promises (express or implied), such that the defendant's will was overborne and his or her capacity for self-determination was critically impaired." *United States v. Pierce*, 152 F.3d 808, 812 (8th Cir. 1998) (citing *Sumpter v. Nix*, 863 F.2d 563, 565 (8th Cir. 1988) (citation omitted)). This inquiry requires courts to assess "the conduct of law enforcement officials and the suspect's capacity to resist any pressure." *Id.* (citing *United States v. Meirovitz*, 918 F.2d 1376, 1379 (8th Cir. 1990) *cert. denied*, 502 U.S. 829, (1991)). More specifically, a court considers, "among other things, the degree of police coercion, the length of the interrogation, its location, its continuity, and the defendant's maturity, education, physical condition, and mental condition." *United States v. Sanchez*, 614 F.3d 876, 883 (8th Cir. 2010) (citing *Sheets v. Butera*, 389 F.3d 772, 779 (8th Cir. 2004)). It is also important to note that "[t]actics, including claiming not to believe a suspect's explanations, making false promises, playing on a suspect's emotions, using his respect for his family against him, deceiving the suspect, conveying sympathy, and even using raised voices, do not render a confession involuntary unless the overall impact of the

interrogation caused the defendant's will to be overborne." *United States v. Magallon*,

984 F.3d 1263, 1284 (8th Cir. 2021) (cleaned up).

In this case, Childers bases his argument that his statements were not voluntary

based on the following conduct that occurred after he was read his *Miranda* rights:

> The next 20 or more minutes is a back and forth about whether Childers
> wanted to talk to the agents, during which, amongst other considerations, the
> officers informed hm [sic] he was going to get indicted federally, that he was
> facing at least 15 years, one of the investigators told him "I'm the only thing
> that can help you right now" (7:40), "that if you don't (talk), she (prosecutor)
> will max you out" (8:40), that Childers indicated he wanted more time to
> think about it (11:10), that the officer told him, "when I leave this room its
> over." Id. Childers was told: "I'm your best option," to which Childers states
> "I can't talk right now" (16:58), the officer tells him he is in "another
> category and facing 15 years" (18:20) and that "now's the time to help
> yourself." (18:40). Finally, after twenty or so minutes of this type of back-
> and-forth interrogation, Childers reluctantly starts answering the officers'
> questions, and only then continues into an additional 20 minutes or so of
> extended dialogue, during which Mr. Childers makes incriminating
> statements.

(Dkt. 43 at 24.)

An officer from the Minneapolis Police Department and an ATF agent met with

Childers to execute a search warrant for his DNA. (Gov't Ex. 4 at 00:01-21.) It was also

noted that Childers reached out to ask to talk to the officers. (*Id.* at 01:20-23, 1:50-2:00.)

After the DNA swab had been taken, the officers read Childers' *Miranda* rights including

that Childers:

- Had the right to remain silent.

- Anything he said would be used against him in court.

- He had the right to talk to a lawyer now and have him present or at any time during questioning, and that if he could not afford an attorney, he could have an attorney appointed without cost.

(*Id.* at 3:48-4:11.) Childers was asked if he understood these rights, and he responded, "yes." (*Id.* at 4:11-12.)

After Childers' rights had been read, officers reiterated that he had wanted to talk to them and so asked him what he wanted to talk about. (*Id.* at 4:12-32.) Officers responded to Childers' question whether the "Feds were building a case against me?" that he was going be to federally indicted for being a felon in possession of firearms and that most likely those charges were going to stick. (*Id.* at 4:32-5:09.) One of the law enforcement officers also represented that he had talked to the assistant United States Attorney ("AUSA") on the case and noted that she was the one that would make the final call, but if there was no cooperation, the AUSA was going to come after Childers, and that if he received information from Childers that he cooperated, the officer believed that the AUSA would consider working with Childers a little bit. (*Id.* at 5:09-5:50.). The officer also communicated that Childers was going to go to federal prison for a while if he was convicted. (*Id.* at 5:50-6:06.) Childers noted that the search and seizure could get thrown out, and the officer responded that it absolutely could as to the Brooklyn Park incident, but that Childers would "eat it" as to the bullets found on his person as to Burnsville incident. (*Id.* at 6:06-55.)

The officer then stated that if Childers wanted to cooperate, he could certainly work with him and if not, there were no hard feelings. (*Id.* at 6:55-7:10.) The officer

noted that he was the only one who could help Childers, and that if Childers provided some information then he could put something in the "good stuff folder with the AUSA." (*Id.* at 7:10-8:00.) Childers then wondered if cooperating would really help him or whether it was going to put him in prison with people who want to stab him, to which an officer responded that if Childers did not help, the AUSA was going to "max him out." (*Id.* at 7:10-8:41.) The officer did qualify his statement as to the amount of prison time that Childers might receive but claimed that Childers could qualify as an armed career criminal, which would put him in the 10-15-year range. (*Id.* at 8:41-9:10.) Childers proceeded on multiple occasions during this interview to try to figure out what he could get from the officers in return for providing information, to which the officers responded that they did not know, but that it would have to be something good and that they could not make any guarantees or promises. (*Id.* at 10:30-11:10.) When Childers asked if he could think about talking to them, one of the officers responded that if he left the room, he was not going to come back to talk with Childers. (*Id.* at 11:10-13.) During his deliberation, Childers noted that he was going to be doing time even if he cooperated, which an officer responded was correct, but the ultimate sentence could potentially vary depending on his cooperation. (*Id.* at 14:48-14:57.) Childers also stated that he needed to think about cooperating because of "everything on his plate" as to the charges he was facing, however, officers pushed back on this statement noting that he asked them to come, and then reminded him of the upcoming federal indictment based on the Burnsville incident, that the AUSA wanted 10-15 years, and that if Childers wanted to help himself, "now was the time." (*Id.* at 16:00-18:29.). Childers again contemplated waiting to talk

with the officers until he saw the federal indictment, but they claimed they could not come talk to him again because attorneys would be involved, and while they could work through attorneys, some AUSAs did not like doing so. (*Id.* at 19:00-45.) Childers stated that he did not feel like he could talk at this point and apologized for having them come in, and the officers again claimed that they might not come back. (*Id. at* 20:00-21:15.) The officers then began asking specific questions and Childers began providing responses soon thereafter. (*Id*. at 21:43-47:11.)

The Court considers whether Childers' decision to talk after being advised of his *Miranda* rights was a voluntary waiver of those rights. First, Childers has not argued that the officers falsely described the possible sentencing scenarios Childers was facing. The Court concludes that the officers' explanation of how the federal system works and possible sentencing outcomes did not overbear Childers' will to voluntarily speak. *See Dowell v. Lincoln Cty., Mo*., 762 F.3d 770, 776 (8th Cir. 2014) ("An officer, however, may make a truthful statement regarding a possible punishment without it overbearing a defendant's will."); *see also Simmons v. Bowersox*, 235 F.3d 1124, 1133 (8th Cir. 2001) (quoting *United States v. Ballard*, 586 F.2d 1060, 1063 (5th Cir. 1978)) ("A truthful and noncoercive statement of the possible penalties which an accused faces may be given to the accused without overbearing one's free will. . . ."); *see also United States v. Gallardo–Marquez*, 253 F.3d 1121, 1123 (8th Cir. 2001) (upholding statements as voluntary because the conduct of the police officers was not calculated to overbear defendant's will where the officers told defendant he would receive a life sentence when the sentence was for 32 years).

Second, "[a]lthough a promise made by law enforcement is a relevant consideration in assessing police conduct, it is only one circumstance to be considered and does not render a confession involuntary per se." *Simmons*, 235 F.3d at 1133 (citing *United States v. Larry*, 126 F.3d 1077, 1079 (8th Cir. 1997); *Kilgore*, 58 F.3d at 353) (indicating that even if the suspect had been promised some form of leniency, this circumstance alone would not render his confession involuntary)); *see also United States v. LeBrun*, 363 F.3d 715, 725 (8th Cir. 2004) (finding that a promise made by law enforcement does not render a confession involuntary per se) (citations omitted).  Here, the officers promised Childers nothing.  At most, an officer told Childers that he would make sure that the AUSA would know that he had helped, and that could affect his ultimate sentence.  However, the officers also communicated that Childers' information would have to be good, they could not guarantee anything, and they could make no promises, and Childers' belief to the contrary is irrelevant.  *See generally LeBrun*, 363 F.3d at 725 (citations omitted) (finding that a mistaken belief of promised leniency would not render confession involuntary).

The fact that Childers was read his *Miranda* rights also weighs in favor of a voluntariness finding.  *See United States v. Otters*, 197 F.3d 316, 318 (8th Cir. 1999) (citations omitted) (concluding that a reading of *Miranda* weighs in favor of a finding of voluntariness where promises of leniency have been made to a defendant).

Moreover, the Court notes that Childers initiated contact to speak with law enforcement, it appears he has had previous experience with law enforcement based on his conversation with the officers, and the officers were polite and conversational

throughout the interview. Contrary to the assertion in his brief, Childers appeared coherent and in control of his faculties during the conversation, at no time did he indicate that he was uncomfortable or that he needed anything, and the interview only lasted for approximately 45 minutes. All this also supports a finding that Childers' statements were voluntary. *See United States v. Libby*, No. 15-CR-182 (DWF/LIB), 2016 WL 937908, at *13 (D. Minn. Feb. 11, 2016) (citing *United States v. Mims*, 567 F. Supp. 2d 1059, 1080 (D. Minn. 2008), *R.&R. adopted*, 2016 WL 953234 (D. Minn. Mar. 11, 2016).

In sum, based on the totality of the circumstances, the Court concludes that the overall impact of the interrogation did not cause Childers' will to be overborne, and therefore that his statement post-*Miranda* was voluntary.

Childers also asserts that the waiver was not knowing and intelligent, but appears to conflate this argument with his assertion that he did not make a voluntary statement, except with respect to his assertion he was confused, disorganized in his thoughts, despondent, desperate, and reluctant to talk to the officers. (Dkt. 43 at 26-27.) "To make a knowing and intelligent waiver, the defendant must have 'full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.'" *United States v. Gallardo*, 495 F.3d 982, 990 (8th Cir. 2007) (quoting *Moran v. Burbine*, 475 U.S. 412, 421 (1986)). Based on the totality of the circumstances, the Court concludes that Childers made a knowing and intelligent waiver of his rights. As discussed above, after being read each *Miranda* right, Childers indicated he understood knowing his rights, and at the end of the reading, noted no questions about any of the rights. As stated previously, there is nothing in the record before this Court to suggest

that Childers was confused or misunderstood his rights or what he was giving up by proceeding to speak with the officers to the level that he could not understand his rights. Instead, any confusion pertained to the interplay between the state and federal charges and how cooperating would benefit him, as opposed to the nature of his *Miranda* rights.

For all of the reasons stated above the Court recommends denying the motion to suppress statements.[9]

### III.   <u>RECOMMENDATION</u>

Based on the files, records, and proceedings herein, **IT IS RECOMMENDED THAT:**

1.      Defendant's Motion to Suppress Evidence Obtained as a Result of Search and Seizure (Dkt. 22) be **DENIED** and;

2.      Defendant's Motion to Suppress Statements, Admissions, and Answers (Dkt. 23) be **GRANTED** in part and **DENIED** in part as follows:

a.      Defendant's Motion to Suppress be **GRANTED** in so far as the Government will not be allowed to use any statements inquiring as to Defendant's status

---

[9]      The Court notes that Childers also argues that the statements should be suppressed because they are the "derivative fruit" of the previous illegal searches and seizure. (Dkt. 43 at 27-28.) The Government argues that Childers has failed to establish a sufficient nexus between the any the any illegal search and seizure and the September 2020 interview. (Dkt. 44 at 37.) A "defendant bears the initial burden of establishing the factual nexus between the constitutional violation and the challenged evidence." *United States v. Goodale*, 738 F.3d 917, 922 (8th Cir. 2013) (quoting *United States v. Riesselman*, 646 F.3d 1072, 1078 (8th Cir. 2011), quoting *United States v. Marasco*, 487 F.3d 543, 547 (8th Cir. 2007)). Having found that the none of the evidence seized should be suppressed, the Court also finds that the interview should not be suppressed as a derivative fruit of an illegal seizure.

as a felon or any statements from him resulting from Officer Porras telling him that he

could not even possess bullets.

      b.      Defendant's Motion to Suppress be otherwise **DENIED**.

DATE:      September 27, 2021      *s/ Elizabeth Cowan Wright*
                                  ELIZABETH COWAN WRIGHT
                                  United States Magistrate Judge

## <u>NOTICE</u>

This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under District of Minnesota Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation. A party may respond to those objections within 14 days after being served a copy of the objections. D. Minn. LR 72.2(b)(2). All objections and responses must comply with the word or line limits set for in D. Minn. LR 72.2(c).